1  LOCKE LORD BISSELL & LIDDELL LLP
2  Thomas J. Cunningham (SBN: 263729)
   tcunningham@lockelord.com
3  Kayla Birns (SBN: 253842)
   kbirns@lockelord.com
4  300 South Grand Avenue, Suite 2600
   Los Angeles, California 90071
5  Telephone:  213-485-1500
   Facsimile:   213-485-1200
6
   Attorneys for Defendant
7  GMAC MORTGAGE, LLC fka GMAC Mortgage Corporation

8              UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10                        **CV09-04280 RSWL (SSx)**

11  ANTONIO CIMMARRUSTI and           )  CASE NO.
    STELLA S. CIMMARRUSTI,            )
12                                    )  **NOTICE OF REMOVAL**
                                      )  **[28 U.S.C. §§ 1331 and 1441]**
13                    Plaintiffs,     )
        vs.                           )
14                                    )
                                      )  [Superior Court of California, County of
15  AURORA LOAN SERVICES, LLC;        )  Los Angeles, Case No. EC 050064]
    QUALITY LOAN SERVICE CORP;        )
16  MORTGAGE ELECTRONIC               )  Complaint Filed: May 29, 2009
    REGISTRATION SYSTEMS, INC;        )
17  VAHE HAYRAPETIAN; GMAC            )
    MORTGAGE, LLC fka GMAC            )
18  MORTGAGE CORPORATION;             )
    KATHY OHANIANS; FIRST             )
19  FUNDERS; and Does 1 through 30,   )
    inclusive,                        )
20                                    )
21                                    )
                      Defendants.     )
22                                    )

23  TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO ALL

24  INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

25        Pursuant to 28 U.S.C. §§ 1331, 1367, 1441 and 1446, Defendant GMAC

26  Mortgage, LLC ("GMACM") hereby removes this action from the Superior Court of

27  California, County of Los Angeles, to the United States District Court for the Central

28  District of California, Western Division, and states as follows:

                                      1

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

CONFORM COPY

## STATEMENT OF THE CASE

1.     On May 29, 2009, an action was commenced in the Superior Court of California, County of Los Angeles, entitled *Antonio Cimmarrusti and Stella S. Cimmarrusti v. Aurora Loan Services LLC; Quality Loan Service Corp; Mortgage Electronic Registration Systems, Inc; Vahe Hayrapetian; GMAC Mortgage, LLC fka GMAC Mortgage Corporation; Kathy Ohanians; First Funders; and Does 1 through 30, inclusive*, Case No. EC 050064 (the "State Court Action").

2.     The first date upon which GMACM became aware of the State Court Action was June 1, 2009, when Plaintiffs served GMACM with a copy of the summons and Complaint from the state court.  This Notice of Removal is being filed within 30 days of GMACM's receipt (and within 30 days of filing) of the Complaint and is therefore timely in accord with 28 U.S.C. § 1446(b).

3.     The Complaint purports to assert four causes of action, identified and/or generally alleged as follows: (1) Intentional Misrepresentation; (2) Fraudulent Inducement; (3) Predatory Lending Practices; and (4) Injunctive Relief.

## FEDERAL QUESTION JURISDICTION

4.     A case may be removed to a federal court if it could have been brought in that federal court originally.  28 U.S.C. § 1441(b).

5.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States.  The Supreme Court has held that "a case 'arose under' federal law where the vindication of a right under state law necessarily turned on some construction of federal law." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9 (1983).  In their third cause of action, Plaintiffs generally allege violations of "the Federal Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. 1637, the Truth in Lending Act (TILA) 1601; [and] Regulation Z, 12 C.F.R. 22" and specifically allege violations of 15 U.S.C. § 1639(h) as the basis for that claim.  (Compl. ¶¶ 28, 30, 31.)  In the first cause of action in the Complaint, Plaintiffs also allege violations of "federal rules

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

relating to the truth in lending" (Compl. ¶ 22). Accordingly, this case turns upon federal questions, and this Court has jurisdiction.

## SUPPLEMENTAL JURISDICTION

6.    Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Plaintiffs' state and common law claims. It is well settled that federal district courts have supplemental jurisdiction over state law claims that share a "common nucleus of operative facts" with a federal claim. *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164-65 (1997). Plaintiffs' state and common law claims, and Plaintiffs' claims based upon alleged violations of TILA and its implementing regulations and under HOEPA, form part of the same case or controversy and, accordingly, arise out of a common nucleus of operative facts.

## REMOVAL REQUIREMENTS

7.    Defendant Quality Loan Service Corporation ("Quality Loan") was served in this action on or before June 5, 2009. Quality Loan has consented to the removal of this action to the United States District Court for the Central District of California, Western Division. Quality Loan's Consent to Removal has been filed concurrently with this Notice of Removal.

8.    Upon information and belief, no other named defendants have been served in this action. Accordingly, all properly served and joined defendants, excluding nominal, unknown, and fraudulently joined parties, have consented to this Removal. *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1 (9th Cir. 1988) (the consent requirement applies "only to defendants properly joined and served in the action").

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1441(a) because the Central District of California, Western Division is the federal judicial division embracing the Superior Court of California for the County of Los Angeles, where the State Court Action was originally filed.

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

3

10.    Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of all of the process, pleadings, and orders on file in the State Court Action that have been served on GMACM are attached hereto as *Exhibit A*.

## **CONCLUSION**

By this Notice of Removal and the associated attachments, GMACM does not waive any objections it may have as to service, jurisdiction or venue, or any other defenses or objections it may have to this action. GMACM intends no admission of fact, law or liability by this Notice, and expressly reserve all defenses, motions and/or pleas. GMACM hereby removes the State Court Action to this Court.

Dated:  June 15, 2009                LOCKE LORD BISSELL & LIDDELL LLP

By: _____
        Thomas J. Cunningham
        Kayla Birns
        Attorneys for Defendant
        GMAC MORTGAGE, LLC

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

626849v.2            NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AURORA LOAN SERVICES, LLC; QUALITY LOAN SERVICE CORP;
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC; VAHE
HAYRAPETIAN; GMAC MORTGAGE LLC fka GMAC MORTGAGE
CORPORATION; KATHY OHANIANS; FIRST FUNDERS; and Does
1 through 30, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ANTONIO CIMMARRUSTI and STELLA S. CIMMARRUSTI,

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ORIGINAL FILED
MAY 29 2009
LOS ANGELES
SUPERIOR COURT

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.   If you cannot pay the filing fee, ask the court clerk for a fee waiver form.   If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.  Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>BURBANK SUPERIOR COURT<br>300 East Olive Avenue<br>Same<br>Burbank, CA 91502<br>North Central | CASE NUMBER:<br>*(Número del Caso):*<br>**EC 050064** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
WALTER R. LUOSTARI #94326                         (818) 790-2044   (818) 949-4925
BURLISON & LUOSTARI
1117 Foothill Boulevard
La Canada, CA 91011

DATE: **MAY 29 2009**   JOHN A. CLARKE   Clerk, by _____, Deputy
*(Fecha)*                    *(Secretario)*                                *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* GMAC mortgage LLC fka GMAC Mortgage Corporation

   under: ☒ CCP 416.10 (corporation)              ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☒ other *(specify):* LLC
4. ☒ by personal delivery on *(date):* 6/1/09

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

Exhibit A , Pg. 5

WALTER R. LUOSTARI,  Bar No. 94326
Burlison & Luostari
1117 Foothill Boulevard, Suite A
La Canada, California 91011
Tel (818) 790-2044
Fax (818) 949-4925

Attorney for plaintiffs Antonio Cimmarrusti and Stella
Cimmarrusti

ORIGINAL FILED
MAY 29 2009
LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ANTONIO CIMMARRUSTI and STELLA S. ) CIMMARRUSTI, | Case No.: **EC 050064** |
| Plaintiff, | COMPLAINT FOR INTENTIONAL MISREPRESENTATION; NEGLIGENT MISREPRESENTATION; CONSTRUCTIVE FRAUD (BREACH OF FIDUCIARY DUTY); NEGLIGENCE;TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION; UNFAIR BUSINESS PRACTICES |
| vs. | |
| AURORA LOAN SERVICES, LLC; QUALITY LOAN SERVICE CORP; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,INC; VAHE HAYRAPETIAN; GMAC MORTGAGE, LLC fka GMAC MORTGAGE CORPORATION; KATHY OHANIANS; FIRST FUNDERS; and Does 1 through 30, inclusive, | |
| Defendants. | |

Plaintiffs allege as follows:

<u>**FIRST CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION AGAINST**</u>

<u>**GMAC, AURORA, MERS, AND DOES 1 THROUGH 10**</u>

1. Plaintiffs are informed and believe and thereon allege that defendant  at all times herein

mentioned, GMAC MORTGAGE, LLC ("GMAC") was and now a limited liability company

organized and existing under the laws of the State of Delaware and conducting business in Los

1

COMPLAINT

Angeles County, State of California and is a lender engaged in making and selling risky loans during the last several years when the obligations for the plaintiffs' complaint were incurred.

2. During the last several years the defendants engaged in negligent lending practices in areas of Los Angeles which had an exceptionally high ratio of homes with large amounts of equity for the purpose of generating subprime loans for sale to investors. The defendants used negligent and fraudulent enticements, such as a "teaser" interest rate that changed dramatically, one month after the loan closing, to convince buyers to obtain loans that they would not have qualified for with conventional lending practices. These policies led to borrowers taking on loans that they were not capable of paying.

3. Plaintiffs are informed and believe and thereon allege that defendant VAHE HAYRAPETIAN was, and now is a resident of Los Angeles County State of California and an Associate District Manager of defendant GMAC.

4. Plaintiffs are informed and believe and thereon allege that defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,INC. ("MERS") was and now is a corporation organized and existing under the laws of the state of Delaware; that MERS is conducting business in Los Angeles County, State of California and acting solely as a nominee for GMAC, and GMAC'S successors and assigns, including, but not limited to defendant AURORA LOAN SERVICES, LLC and is the alleged beneficiary under the Deed of Trust hereinafter referenced.

5. Plaintiffs are informed and believe and thereon allege that defendant FIRST FUNDERS is KATHY OHANIANS ("OHANIANS") was, and now is a resident of Los Angeles County, State of California and a licensed real estate agent acting on behalf of FIRST FUNDERS; that FIRST FUNDERS is a corporation existing under the laws of the State of California and a licensed real estate broker.

2

COMPLAINT

Exhibit A, Pg. 7

6. Plaintiffs are ignorant of the true names and capacities of DOES 1 through 30, inclusive, and therefore sue said defendants by their fictitious names. Plaintiffs will amend this complaint to insert the true names and capacities of said defendants when ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is liable in some manner for the acts and occurrences hereinafter alleged and in doing the things hereinafter alleged, proximately caused plaintiffs' damages.

7. Plaintiffs are informed and believe and thereon allege that at times herein mentioned, defendants and Does 1 through 10, inclusive, were and now are the agents, servants and employees of defendant GMAC; that defendants Does 11 through 20, inclusive were and now are the agents, servants and employees of defendant MERS; defendants Does 1 through 10, inclusive, were and now are the agents, servants and employees of defendant GMAC and in doing the things hereinafter alleged each of the fictitiously named defendants was acting within the course and scope of said agency and employment and with the ratification and consent of defendants Dilbeck.

8. Plaintiff are the owners of real property located at 3344 Wedgewood Lane, Burbank, California ("subject property").

9. GMAC motivation was to generate as many loans as possible for sale to investors in the United States and abroad. AURORA's motivation was to purchase as many of the subprime and fraudulently generated loans at a discount to tap into the huge windfalls that would be created by borrowers defaulting on loans secured by real property with huge amounts of equity. Plaintiffs were victims of such sales effort. They were offered the subject property through Kathy Ohanians who steered plaintiffs to her brother, Hayrapetian acting for GMAC, who also sold a subsequent loan which plaintiffs obtained from GMAC to refinance the GMAC loan and HELOC loan in an effort to reduce their interest rate, which action was compelled by the original

3

COMPLAINT

acts and conduct of GMAC, Hayrapetian, Ohanians and First Funders when they misled plaintiffs into purchasing the subject property.

10. Defendants GMAC and Hayrapetian failed to explain the terms of the loan or to explain that Hayrapetian had a conflict of interest as he was paid a "YSP" fee to steer the plaintiffs into a high rate adjustable rate negatively amortized loan that was not what Plaintiffs had agreed to undertake. Plaintiffs are informed and believe and thereon allege that the broker was paid a YSP fee tied to the amount by which the interest rate was increased from prevailing rates.

11. Plaintiffs were advised they would receive a 40 year interest only loan. After the loan closing the lender disclosed that it had mislead the plaintiffs and had really issued them an Adjustable Rate Mortgage (ARM) negative amortization loan, which was not what had been represented nor agreed upon. Hayrapetian did not meet with plaintiffs, plaintiffs did not sign any loan application and Hayrapetian greatly inflated plaintiffs' income and amount in their savings account. Plaintiffs would not have otherwise qualified for the loan or purchase of the subject property. Defendant Kathy Ohanians, sister of defendant Hayrapetian, working in concert and conspiracy with Hayrapetian and GMAC, convinced plaintiffs that they could afford the subject property when plaintiffs first told Ohanians that they did not care for the home and did not think that they could afford to purchase the subject property. During the loan process, plaintiffs did not personally interact with Hayrapetian, but provided a savings account statement to Ohanians at her request during the home purchasing process. Later, plaintiffs discovered that Ohanians had somehow altered plaintiffs' savings account statement to show savings of some $500,000.

12. Plaintiffs did not meet with Hayrapetian at any time during the loan process for the purchase nor subsequent refinance of the loan necessitated by defendants' initial fraud.

4

COMPLAINT

Defendant Hayrapetian did not explain any of the loan terms or documents that they were required to sign, and at the closing, plaintiffs only met with the escrow officer who flip through pages and told plaintiffs' where to sign.

13. Plaintiffs are informed and believe, and upon such information and belief thereon alleges that neither AURORA nor MERS are the holders of the Note identified in the security instrument that is identified in Exhibit 1, is not in possession of the note properly endorsed to it, nor is it otherwise entitled by the laws of the State of California to have initiated its foreclosure under the security instrument identified in Exhibit 1.

14. MERS, had no right to initiate foreclosure under the security instrument identified in the Notice of Sale attached as Exhibit 1, nor did it have the right to direct QUALITY, to foreclose and sell the Subject real property owned by Plaintiff. MERS, and, QUALITY had been put on notice of Plaintiffs claim in this regard and demand had been made of MERS and, QUALITY to suspend any foreclosure sale unless and until it has obtained proof that PLATINUM CAPITAL GROUP, and /or, MERS, actually has in its possession the original Note properly endorsed to it or assigned to it as of a date preceding the notice of default recorded by QUALITY.

15. MERS, and QUALITY, failed and refused to suspend the sale of the property or to provide proof of the basis of the right of PLATINUM CAPITAL GROUP, and/or MERS, to perfect foreclosure under the security instrument referred to in Exhibit 1.

16. Plaintiff alleges that the Defendants, and each of them, in so acting in this case with respect to many other mortgage or trust deed security instruments engage in a pattern and practice of utilizing the non-judicial foreclosure procedures of the State of California to foreclose on properties when they are in violation of the Office of the Comptroller of Currency ("OCC")

5

Exhibit A , Pg. 10

guidelines to prevent predatory residential mortgage lending practices, or standards designed to protect against predatory, abusive, unfair, or deceptive mortgage lending practices issued on February 2, 2005.

17. Plaintiffs were not required to supply any documents that would show that they had the income to make the payments called for by said loans. They were given an ARM loan that was far riskier than a fixed rate loan, which they would have been qualified for at a lower amount and would have been readily understood. The business practices of the lenders in writing "no doc" loans were an invitation to unwitting borrowers to take on more financial obligations that they could possibly handle.

18. By reason of the predatory, abusive, unfair and deceptive lending practices of the defendants, the plaintiffs were fraudulently induced to purchase the subject property. As a result the note and deed of trust were tainted as they had been produced by the fraudulent activities of the defendants.

19. Plaintiffs discovered after close of the refinance loan escrow that the loan was a negative amortization loan and attempted to workout and modify the loan after learning that GMAC had transferred servicing of the loan to AURORA. Plaintiffs were told by an AURORA representative that they should default on their loan in order to modify their loan terms. Based on this representation and advice, plaintiffs ceased making their monthly loan payments and attempted to modify their existing loan. As a result of the non-payment of the loans the defendant began to threaten foreclosure of the first trust deed, have refused to modify their loan and have set a sale of the subject property for June 2, 2009.

6

COMPLAINT

Exhibit A, Pg. 11

20. In threatening a non-judicial foreclosure the defendants and each of them, have represented that they had the right to payment under a note and further have the right to conduct a non-judicial foreclosure sale.

21. Plaintiffs allege that the defendants violated California Business and Professions Code 17500 by making untrue and misleading statements about the terms of the loans and sale of the property given to Plaintiff.

22. Plaintiff is informed and believes defendants have no right to foreclose on the subject property, when in fact the loan that the Plaintiffs had been fraudulently induced to sign was invalid, and violated federal rules relating to truth in lending.

## SECOND CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT
## (AS TO ALL DEFENDANTS)

23. Plaintiffs reallege and incorporate herein by this reference all prior allegations of the complaint.

24. Plaintiffs are informed and believe and thereon allege that defendants failed to verify Plaintiffs' ability to repay the loan that they wrote, manufactured facts and figures that would show that Plaintiffs had the ability to repay the loan, mislead the Plaintiffs as to the terms and conditions of the loans and real property purchase, failed to fully disclose of the terms and conditions of the loans that Plaintiffs should have known to be able to make an informed decision about the ability of the Plaintiffs to make the payments required, and engaged in unlawful actions to justify their predatory, abusive, unfair and deceptive lending practices to generate fees and to tap into huge equity existing in the Los Angeles Area of approximately $500,000,000,000.

25. Defendants lowered their own underwriting standards, and actually are believed to have suspended all underwriting standards, in order to provide the Plaintiffs with loans that were

7

COMPLAINT

financially unbearable and burdensome and place the Plaintiffs in a position where it was likely that they would default on the loans and lose the investment he had made.

26. Plaintiffs were justified in relying on the expertise of the defendants in that they held themselves out as being capable of determining the size loan and terms that Plaintiffs would be able to manage without undue risk of loss. The defendants concealed the fact that the loan they were writing was a negative amortization loan after they had represented that it would be an interest only note and failed to consider a fixed rate loan because the agent received a higher YSP for an ARM negative amortization loan. The defendants violated California Business and Professions Code 17500 by making untrue and misleading statements about the loan given to Plaintiff and terms of the purchase.

## THIRD CAUSE OF ACTION PREDATORY LENDING PRACTICES
## (AS TO ALL DEFENDANTS)

27. Plaintiffs reallege and incorporate herein by this reference all prior allegations of the complaint.

28. Plaintiffs are informed and believe and thereupon allege that the Defendants, and each of them, have collaborated to engage and have engaged in predatory lending practice in violation of the federal Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S. C. 1637, the Truth in Lending Act (TILA) 1601; Federal Regulation Z, 12 C.F. R. 22 and California Business and Professions Code 17500, and the OCC standards and guidelines issued on February 2, 2005, the specifics of which are unknown and are subject to discovery.

29. Plaintiffs are informed and believe and thereon allege that defendants failed to verify Plaintiffs' ability to repay the loans that they were offered, manufactured facts and figures that would show that Plaintiffs had the ability to repay the loan, mislead the Plaintiffs as to the terms

8

COMPLAINT

Exhibit A, Pg. 13

and conditions of the loans, failed to fully disclose of the terms and conditions of the loans in a manner that plaintiffs could understand and should have known to be able to make an informed decision about their ability to make the payments required.

30. Plaintiff alleges on information and belief that defendants violated 15 U.S. C. 1639(h) in making loans and lowering their underwriting standards in order to write loans to minority borrowers that were financially unbearable and burdensome and would subject the Plaintiff to a high risk of losing her property by reason of a non-judicial foreclosure sale.

31. Plaintiff alleges that defendants' violation of 15 U.S. C 1639(h) makes the note written by defendant GMAC and assigned to AURORA for servicing subject to rescission and the payment of compensatory damages to Plaintiff to make the Plaintiff whole for damages suffered.

## FOURTH CAUSE OF ACTION FOR INJUNCTIVE RELIEF (AS TO ALL DEFENDANTS)

32. Plaintiffs reallege and incorporate herein by this reference all prior allegations of the complaint:

33. By reason of the fraudulent conduct of the defendants there is a strong likelihood of the Plaintiffs prevailing on their suit. Plaintiffs will seek leave of the court to prohibit any further actions to interfere with Plaintiffs' use and enjoyment of the property pending determination of this lawsuit.

Wherefore, Plaintiff prays for judgment against the Defendants and each of them, jointly and severally, as follows:

ON THE FIRST AND SECOND CAUSES OF ACTION

1. Compensatory, special and punitive damages according to proof;

9

COMPLAINT

Exhibit A, Pg. 14

ON THE THIRD CAUSE OF ACTION

    2. For rescission, for civil penalties pursuant to statute, for actual damages, punitive damages and reasonable attorneys fees according to proof;

    3. That the actions be declared and deemed to be unfair and deceptive business practices under California law.

ON THE FOURTH CAUSE OF ACTION.

    4. For a preliminary injunction enjoining Defendants and each of them including their agents or assigns from selling or interfering with the Plaintiffs' right, title, interest andpossession of said property pending resolution of the issues herein, including but not limited to selling the subject property at a trustee's sale.

ON ALL CAUSES OF ACTION.

    5. For reasonable costs of suit and such other and further relief as the Court no interest, legal or equitable, in the property described in the complaint;

Dated: May 29, 2009

WALTER R. LUOSTARI
Burlison & Luostari

Attorneys for plaintiffs Antonio
Cimmarrusti and Stella S.
Cimmarrusti

10

COMPLAINT

Exhibit A, Pg. 15

1  WALTER R. LUOSTARI, Bar No. 94326

**ORIGINAL FILED**

Burlison & Luostari
2  1117 Foothill Boulevard, Suite A

JUN - 1 2009

La Canada, California 91011

LOS ANGELES
3  Tel (818) 790-2044

SUPERIOR COURT

Fax (818) 949-4925
4

Attorney for plaintiffs Antonio Cimmarrusti and Stella
5  Cimmarrusti

6

7           SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              FOR THE COUNTY OF LOS ANGELES

9

10  ANTONIO CIMMARRUSTI and STELLA S. )   Case No.: EC 050064
    CIMMARRUSTI,                      )
11                                     )   Hon. Michelle R. Rosenblatt
                                       )
12            Plaintiff,               )   TEMPORARY RESTRAINING ORDER
                                       )   AND ORDER TO SHOW CAUSE RE
13     vs.                             )   PRELIMINARY INJUNCTION
                                       )
14  AURORA LOAN SERVICES, LLC;         )
    QUALITY LOAN SERVICE CORP;         )
15  MORTGAGE ELECTRONIC               )
    REGISTRATION SYSTEMS,INC; VAHE     )   Date: July 31 ~~June~~, 2009
16  HAYRAPETIAN; GMAC MORTGAGE,        )   Time: ~~8:30 a.m.~~ 9 a.m.
    LLC fka GMAC MORTGAGE              )   Dept: "A"
17  CORPORATION; KATHY OHANIANS;       )
    FIRST FUNDERS; and Does 1 through 30, )
18  inclusive,                         )
                                       )
19                                     )
                                       )
20            Defendants.              )

21

22      On reading the complaint on file in the above-entitled action, and the Declaration of

23  plaintiffs Antonio Cimmarrusti and Stella Cimmarrusti and the supportive Memorandum of

24  Points and Authorities submitted herewith, and it appearing to the satisfaction of the Court that

25  this is a proper case for granting an Order to Show Cause and temporary Restraining Order, and

26  that unless the Temporary Restraining Order prayed for in the complaint be granted, great or

27  irreparable injury will result to plaintiffs before the matter can be heard on notice.

28      IT IS HEREBY ORDERED, that defendants, GMAC MORTGAGE, LLC fka GMAC

MORTGAGE CORPORATION ("GMAC"); MORTGAGE ELECTRONIC REGISTRATION

1

Exhibit A, Pg. 16

1   SYSTEMS,INC. ("MERS"), AURORA LOAN SERVICES, LLC and QUALITY LOAN

2   SERVICE CORPORATION, appear in Department "A" of this Court, located at 300 East Olive

3   Avenue, Los Angeles, California on ~~June~~ July 31, 2009, at ~~8:30~~ 9am a.m., or as soon thereafter as the

4   matter may be heard, then and there to show cause, if any they have, why they, and each of them,

5   and their agents, servants, employees, representatives, and all persons acting in concert with

6   them, should not be enjoined and restrained during the pendency of this action from engaging in,

7   committing, or performing, directly or indirectly, any and all of the following acts:

8        (a) foreclosing on that certain real property located 3344 Wedgewood Lane, Burbank,

9   California (herein "subject property");

10       (b) conducting a trustee's sale, or otherwise selling the subject property under that certain

11  deed of trust held by GMAC and MERS or assigned to AURORA for servicing;

12       (c) disposing of the subject property in any manner, including, but not limited to

13  executing or issuing a Trustee's Deed on Foreclosure or otherwise transferring title to the subject

14  property to any person;

15       (d) selling, assigning or otherwise transferring any interest in the promissory note and

16  deed of trust held in the name of GMAC and MERS or assigned to AURORA for servicing to

17  any person(s).

18       IT IS FURTHER ORDERED, that pending the hearing and determination of the Order

19  To Show Cause, the above-named defendants, and each of them, and their officers, agents,

20  employees, representatives, and all persons acting in concert or participating with them, shall be

21  and they are hereby restrained and enjoined from engaging in or performing, directly or

22  indirectly, any and all of the following acts:

23       (a) foreclosing on that certain real property located at 3344 Wedgewood Lane, Burbank,

24  California;

25       (b) conducting a trustee's sale, or otherwise selling the subject property under that certain

26  deed of trust held by GMAC and MERS or assigned to AURORA for servicing;

27

28

2

TRO and OSC RE PRELIMINARY INJUNCTION

Exhibit A, Pg. 17

1        (c) disposing of the subject property in any manner, including, but not limited to

2    executing or issuing a Trustee's Deed on Foreclosure or otherwise transferring title to the subject

3    property to any person;

4        (d) selling, assigning or otherwise transferring any interest in the promissory note and

5    deed of trust held in the name of GMAC and MERS or assigned to AURORA for servicing, to

6    any person(s).

7        IT IS FURTHER ORDERED, that copies of the complaint, memorandum of points and

8    authorities, declarations and this Order to Show Cause, and Temporary Restraining Order be

9    served on Defendants not later than June 1, 2009, *by personal service. Proof of*

10   *service must be filed no later than 10 days before the hearing.*
         Bond on the Temporary Restraining Order is waived. *Opposition must be served and filed by July 16, 2009.*

11   *Reply, if any, must be served and filed by July 24, 2009.*

12   Dated: June 1, 2009

13                    MICHELLE R. ROSENBLATT, JUDGE OF THE
                      SUPERIOR COURT

TRO and OSC RE PRELIMINARY INJUNCTION

Exhibit A, Pg. 18

WALTER R. LUOSTARI,  Bar No. 94326
Burlison & Luostari
1117 Foothill Boulevard, Suite A
La Canada, California  91011
Tel (818) 790-2044
Fax (818) 949-4925

Attorney for plaintiffs Antonio Cimmarrusti and Stella
Cimmarrusti

**ORIGINAL FILED**

JUN – 1 2009

LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

|  |  |
|---|---|
| ANTONIO CIMMARRUSTI and STELLA S. CIMMARRUSTI, | Case No.: EC 050064 |
| Plaintiff, | Hon. Michelle R. Rosenblatt |
| vs. | DECLARATION RE NOTICE |
| AURORA LOAN SERVICES, LLC; QUALITY LOAN SERVICE CORP; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,INC; VAHE HAYRAPETIAN; GMAC MORTGAGE, LLC fka GMAC MORTGAGE CORPORATION; KATHY OHANIANS; FIRST FUNDERS; and Does 1 through 30, inclusive, | Date: June ___, 2009 Time: 8:30 a.m. Dept: "A" |
| Defendants. | |

## DECLARATION OF WALTER R. LUOSTARI

I, Walter R. Luostari, declare as follows:

1. The facts declared herein are of my own personal knowledge and if called as a witness, I could and would competently testify thereto.

2. On May 29, 2009 prior to 10:00 a.m., I telephoned defendants GMAC, Aurora Loan Services and Quality Loan Service Corp by calling (619)645-7711 and speaking with "Brad" in

---

DECLARATION RE NOTICE

1

Exhibit A, Pg. 19

the foreclosure department of Quality Loan Service Corp, which is the number provide in the

Notice of Default and Election to Sell and Notice of Trustee's Sale. I advised Brad that I would

be appearing in Superior Court at either 300 E. Broadway, Glendale, Ca, or 300 E. Olive Ave.,

Burbank, Ca., at 8:30 a.m., on June 1, 2009 on an exparte application for a temporary restraining

order restraining the trustee's sale on their T.S. No. CA-09-241687-CL. Brad confirmed that the

T.S. No. pertained to real property involved was 3344 Wedgwood, Burbank, California in the

above-entitled matter. Upon filing the complaint and making a determination of the department

and courthouse, I telephoned Brad and advised him that the Department was Department "A"

located at 300 E. Olive Avenue, Burbank, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing

is true and correct and executed this 31st day of May, 2009.

Walter R. Luostari, declarant

DECLARATION RE NOTICE

2

1  WALTER R. LUOSTARI,  Bar No. 94326
   Burlison & Luostari
2  1117 Foothill Boulevard, Suite A
   La Canada, California  91011
3  Tel (818) 790-2044
   Fax (818) 949-4925
4
   Attorney for plaintiffs Antonio Cimmarrusti and Stella
5  Cimmarrusti

6
7                SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                      FOR THE COUNTY OF LOS ANGELES

9
   ANTONIO CIMMARRUSTI and STELLA S. )   Case No.: EC 050064
10 CIMMARRUSTI,                       )
                                      )   Assigned to: Hon. Michelle R. Rosenblatt
11           Plaintiff,               )
                                      )   EXPARTE APPLICATION FOR
12       vs.                          )   TEMPORARY RESTRAINING ORDER
                                      )   AND OSC RE PRELIMINARY
13 AURORA LOAN SERVICES, LLC;         )   INJUNCTION; DECLARATIONS AND
   QUALITY LOAN SERVICE CORP;         )   MEMORANDUM OF POINTS AND
14 MORTGAGE ELECTRONIC                )   AUTHORITIES
   REGISTRATION SYSTEMS,INC; VAHE     )
15 HAYRAPETIAN; GMAC MORTGAGE,        )
16 LLC fka GMAC MORTGAGE              )   Date: June 1, 2009
   CORPORATION; KATHY OHANIANS;       )   Time: 8:30 a.m.
17 FIRST FUNDERS; and Does 1 through 30, )   Dept: A
   inclusive,                         )
18                                    )
                                      )
19                                    )   Complaint filed: May 29, 2009
                                      )   Trial Date: Not Set
20           Defendants.              )

21 _____

22       Plaintiffs Antonio Cimmarrusti and Stella Cimmarrusti apply exparte for a temporary

23 restraining order and OSC re preliminary injunction enjoining defendants GMAC MORTGAGE,

24 LLC fka GMAC MORTGAGE CORPORATION ("GMAC"); MORTGAGE ELECTRONIC

25 REGISTRATION SYSTEMS,INC. ("MERS"), AURORA LOAN SERVICES, LLC and

26 QUALITY LOAN SERVICE CORPORATION, their agents, servants, and employees, all

27 persons acting in concert or participating with them, and each of them from:

28

                                        1
   _____

   APP. FOR TRO, OSC RE PRELIMINARY INJUNCTION

1       (a) foreclosing on that certain real property located 3344 Wedgewood Lane, Burbank,
2   California (herein "subject property");
3       (b) conducting a trustee's sale, or otherwise selling the subject property under that certain
4   deed of trust held by MERS, AURORA or GMAC;
5       (c) disposing of the subject property in any manner, including, but not limited to
6   executing or issuing a Trustee's Deed on Foreclosure or otherwise transferring title to the subject
7   property to any person;
8       (d) selling, assigning or otherwise transferring any interest in the promissory note and
9   deed of trust held in the name of MERS, GMAC or AURORA to any person(s).
10      This application is made on the grounds that the commission or continuance of the acts of
11  cross-defendants would produce waste, or great or irreparable injury, to a party to the action, that
12  cross-defendants are threatening an act in violation of the rights of cross-complainant respecting
13  the subject of the action, and tending to render the judgment ineffectual, and on the further
14  ground that great and irreparable injury will result to cross-complainant before the matter can be
15  heard on notice.
16      This application is based on the complaint on file herein, on the declarations of plaintiffs
17  Stella and Antonio Cimmarrusti accompanying this application, and memorandum of points and
18  authorities attached hereto, and upon the papers and documents on file in the within action.

19
20  Dated: May 31, 2009                              WALTER R. LUOSTARI
                                                     Burlison & Luostari
21
22
23                                                   Attorneys for plaintiffs Antonio
                                                     Cimmarrusti and Stella S.
                                                     Cimmarrusti
24
25
26
27
28

2

Exhibit _A_, Pg. 22

## DECLARATION OF STELLA CIMMARRUSTI

I, Stella Cimmarrusti, declare as follows:

1. I am one of the plaintiffs herein and as such the facts declared herein are of my own personal knowledge and if called as a witness, I could and would competently testify thereto.

2. I met Lila Ohanians through my husband, Antonio Cimmarrusti. The two met each other while working in the marble and tile industry. They later formed their own company together.

3. A family oriented relationship began as we were invited to Lila Ohanians home for dinner initially with a couple of other co-workers, later evolved to just Lila Ohanians, her daughter Talin Zohrabian in her early 20's, Antonio & Stella Cimmarrusti with their 11 year old son Savio. We were invited over to Lila Ohanians' home for birthdays & holiday parties. We were introduced to all of the family members at these parties. Kathy and Rubik Ohanians (Lila Ohanians' brother) had a formal baptismal party for their twin babies and we were invited. The families became very close and we began to trust the Ohanians family.

4. My husband, Antonio and Lila discussed investing together in real property. At the time many people were buying & selling homes (flipping). Lila's sister-in-law Kathy Ohanians was a real estate agent and Lila Ohanians felt comfortable using her to find a property. In 2005, Antonio and I purchased a rental property with Lila Ohanians. Kathy Ohanians, working for First Funders at the time, showed Antonio several properties before we settled on the purchase of one. The loan officer used for the purchase was Kathy Ohanians brother, Vahe Hyrapetian, who was Associate District Manager of GMAC at the time.

5. In December 2006 Antonio and I were invited by Lila Ohanians for a birthday dinner party. After most of the guests left, Lila's daughter Talin pulled out a real estate flyer for the sale of 3344 Wedgewood Lane in Burbank. Lila and Talin suggested that we should buy this home. My first reaction was, "this house is way too expensive for us and besides it wasn't even the style of home that we liked." Lila and Talin suggested that we should go look at it anyway, and that it would be fun if we would move in and be so close to their new home. They had just

3

Exhibit _A_, Pg. _23_

purchased a new home off of the same street (Wedgewood Lane) in the same community. Lila's brother Rubik and wife Kathy Ohanians and Kathy's brother Vahe Hayrapetian with his wife Shake also lived in the community. A few weeks passed and Lila suggested to Antonio that he have me go look at the Wedgewood property. I went to look at the house just for fun on a weekend with Kathy Ohanians. The broker showing the home was not available and Kathy did not have entry means to the home so we just viewed the home from the outside. A few days later Kathy Ohanians made arrangements to show the house to Antonio Cimmarrusti during lunch.

6. A few days later Antonio, Kathy Ohanians and I viewed the house together. The finances were not discussed at this viewing. The following Friday night Kathy Ohanians invited us over to her house for dinner. It was a family setting with their twin babies present. There were no financial discussions over dinner it was just small talk. After dinner we sat at the kitchen table and Kathy wrote up an offer to purchase the subject property. Nothing was discussed during the write up of the offer other than what I would describe as "chit chat."

7. The house was listed for $1,849,000.00. Antonio and I wanted to offer $1,600,000 and Kathy Ohanians said she knew the market and we should offer full price if we wanted the offer to be accepted. The full price offer was made contingent to the sale of our home in Monrovia. The offer was accepted. Within a few days our home in Monrovia was listed with First Funders through Kathy Ohanians.

9. Kathy with the help of her husband Rubik held an open house the first weekend following the listing. The second week we had an offer on our home. Antonio spoke to Vahe Hayrapetian over the phone and gave our financial information to him over the phone-Vahe never once sat down with us to discuss any information in regard to the loan, not the original loan or the re-finance. Vahe Hayrepetian asked Antonio to fax him three months bank statements. While escrow was in progress and we were under contract to sell our home in Monrovia, Kathy Ohanians asked for one of our savings account statements. She did not explain what she would be doing with it and Antonio and I just thought it was part of the loan process.

10. We received loan documents at our Monrovia home that we were required to sign and return to Kathy, not Vahe Hayrapetian. Vahe Hayrapetian was not there to explain anything-

4

Exhibit A, Pg. 24

1  we just had to sign & return them. While escrow was in progress Kathy told us that we needed

2  more money in order to close. We were short $200,000.00, we didn't have this money so our

3  friend Lila Ohanians offered to loan us the money. Lila had an equity line of credit and gave us

4  the loan.

5      11. We were instructed by Vahe Hayrapetian to go to the escrow office ( Glenoaks

6  Escrow) to sign the paperwork. We signed the paperwork without reading them in good faith

7  knowing that Vahe Hyrapetian had worked on this loan and he told us that we would get the

8  same kind of loan that he had obtained for his sister, Kathy Ohanians, and himself. Antonio and

9  I never met with Vahe Hayrapetian during the entire loan process nor did we sign the loan

10  application. The entire loan process was done over the telephone with Vahe Hayrapetian or if

11  documents were provided they were given to Kathy Ohanians.

12      12. Escrow closed on March 10, 2006 with our minimum monthly payment in the sum of

13  $4,460.34- just as Kathy Ohanians had said it would be. But once we later found out, as stated

14  below, that the loan's principal balance kept increasing, we viewed our paperwork for the

15  purchase and refinance loans. The documents refer to ASAP Escrow but we only recall having

16  gone to Glenoaks escrow office on San Fernando Rd in Glendale, Ca., to sign loan docs. This is

17  confusing to us, we never went to the ASAP escrow office- the paperwork provides an address of

18  Wesminster, Ca., but we never went there. But we did write deposit checks to ASAP Escrow.

19      13. At that time, property values were increasing, so in order to pay back the loan to Lila

20  Ohanians, we took out a Home Equity Line of Credit ("HELOC") linked to the subject property,

21  3344 Wedgewood lane Burbank, Ca., again through GMAC.

22      14. In December of 2006 we decided to re-finance the loan with GMAC and consolidate

23  the two loans into one home loan. Antonio telephoned Vahe Hayrapetian and asked about

24  consolidating the initial GMAC loan and the equity line with GMAC. Vahe Hayrapetian said that

25  we would need to get the property appraised to see if we could do the re-finance. An appraiser

26  provided by Vahe came to do the appraisal. He took a quick look around the house and asked if

27  we had done any improvements to the property- all we had done was fence in the back yard. The

28  home was appraised at approximately $2,000,000.00 and the new loan was written through

5

Exhibit _A_, Pg. 25

GMAC for $1,680,000,00 and again the monthly loan payments were slightly more than $4,000. Again Vahe Hayrapetian filled out the loan application and other paperwork without getting our signatures. Again, we received the initial loan escrow papers by mail to sign at our house in Burbank, from the escrow officer. We were instructed to sign by the flag stickers and return them by mail. We signed the final documents at the Glenoaks escrow at the close of escrow. The only other person present was the escrow officer Jeanette Lomeli. Vahe Hayrapetian never met with us nor discussed with us the terms of the loan or any other aspect of the loan.

15. Sometime later, we noticed that the principal balance kept increasing and proceeded to read some of the loan documents. Noticing the high origination fees on the loan and that this was a negative amortizing loan, I called Vahe Hayrapetian and inquired about all of the fees that were on the loan and the increasing loan balance. Vahe explained that the origination fees were based on the loan amount & asked " Don't you know what type of loan you have?" I replied, "I did not know." Vahe Hayrapetian said that we had a negative ARM Loan. I do not recall exactly the financial term that was used. This was the last conversation we had in this regard. A true and correct copy of the promissory note and deed of trust are attached hereto as Exhibit 1 and are incorporated herein by this reference as though set forth in full.

16. Home values and sales started dropping dramatically in the following months. The value of the home was soon very close to the outstanding loan amount. In May or June of 2007 I called GMAC and inquired about refinancing in order to get out of the negative type of loan so that the principle balance would stop increasing. The GMAC representative explained that due to the loan to value ratio, this could not be done. Antonio and I inquired through a few other lenders about refinancing, but due to the lack of home sales in our area they could not appraise the value of our home. We continued to make our monthly payments on time.

17. In October of 2007 we were given notice that GMAC transferred servicing of our loan to Aurora loans. We continued to make our minimum interest payments on time to our new lender Aurora Loans.

18. In July of 2008, President George W. Bush signed a bill to help struggling homeowners. The news had reported this and suggested that people should call their lenders and

6

Exhibit _A_, Pg. 26

work with them. I therefore called Aurora loans and explained the situation to the representative. The Aurora representative told me that since we had not been late on any payments there was nothing that could be done. She explained that Aurora had a home retention department but that they did not work with you until you had been late on payments and suggested that we default on our loan.

19. Antonio had been hearing about people having similar problems, missing a couple of payments and then working with their lenders to modify their loans. Because of the advice given to us by Aurora and our understanding that others had done the same and modified their loans, we missed our first payment in September of 2008 in the hope that we would be able to modify the loan to a fixed type of loan.

20. In November of 2008 an Aurora representative, whose name I do not recall, working with us on a repayment plan told us that monthly payments would need to be paid while Aurora reviewed the modification package.. We sent the November 2008 repayment payment at a higher amount of $5992.00 to Aurora. But after receiving the payment, Aurora turned around and denied the modification because they said we were not able to qualify.

21. In November 2008, we hired an experienced broker Christian Middleton that claimed to be qualified to work with Aurora who would be successful in modifying our loan. The December 2008 payment was not sent in. In January of 2008, Mr. Middleton notified me that he would be retiring and would not be able work for us.

22. On January 30, 2009, wei hired Option Mediation Services to attempt to work out a loan modification with Aurora. On May 18, 2009 Henry Hart at Option Mediation services worked on a modification with Aurora but based on the household expenses and having to include the pending rental property mortgage as an expense we would need to show more income. Because we could not show more income, Aurora denied the loan modification.

23. We would not have purchased the subject property had we known that the loan Kathy Ohanians and Vahe Hayrapetian were offering was an negative amortization loan. The minimum monthly payments were slightly more than $4,000, however, if we were to make payments that would fully amortize the loan over the life of the loan, our payments would be in excess of

7

$11,000.  Neither Kathy Ohanians nor Vahe Hayrapetian told us that our loans were negatively amortizing and if we made payments of slightly more than $4,000 per month that the principal balance of the loan would be increasing.  We would have continued making the monthly loan payments except that we were told by Aurora that we should stop making the monthly payments if we wanted to get a loan modification.  Aurora has noticed a trustee's sale through Quality Loan Services for June 2, 2009.  Although Aurora is servicing the loan, the deed of trust states that MERS is the beneficiary under the deed of trust as a representative of GMAC.  A true and correct copy of the Notice of Trustees Sale is attached hereto as Exhibit 2 and is incorporated herein by this reference as though set forth in full.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and executed this 30th day of May 2009.

Stella Cimmarrusti, declarant

APP. FOR TRO. OSC RE PRELIMINARY INJUNCTION

Exhibit A, Pg 28

## DECLARATION OF ANTONIO CIMMARRUSTI

I, Antonio Cimmarrusti, declare as follows:

1. I am one of the plaintiffs herein and as such the facts declared herein are of my own personal knowledge and if called as a witness, I could and would competently testify thereto.

2. I met Lila Ohanians while working in the marble and tile industry. We later formed their own company together.

3. A family oriented relationship began as we were invited to Lila Ohanians home for dinner initially with a couple of other co-workers, later evolved to just Lila Ohanians, her daughter Talin Zohrabian in her early 20's, Antonio & Stella Cimmarrusti with their 11 year old son Savio. We were invited over to Lila Ohanians' home for birthdays & holiday parties. We were introduced to all of the family members at these parties. Kathy and Rubik Ohanians (Lila Ohanians' brother) had a formal baptismal party for their twin babies and we were invited. The families became very close and we began to trust the Ohanians family.

4. Lila Ohanians and I discussed investing together in real property. At the time many people were buying & selling homes (flipping). Lila's sister-in-law Kathy Ohanians was a real estate agent and Lila Ohanians felt comfortable using her to find a property. In 2005, Stella and I purchased a rental property with Lila Ohanians. Kathy Ohanians, working for First Funders at the time, showed me several properties before we settled on the purchase of one. The loan officer used for the purchase was Kathy Ohanians brother, Vahe Hyrapetian working for GMAC at the time. A couple of months later another property was purchased with the intention to fix up, sell, and make a profit. Again using Kathy Ohanians as the real estate agent working for First Funders and Vahe Hyrapetian as the loan officer with GMAC.

5. In December 2006 Stella and I were invited by Lila Ohanians to a birthday dinner party. After most of the guests left, Lila's daughter Talin Ohanians pulled out a real estate flyer for the sale of 3344 Wedgewood Lane in Burbank. Lila and Talin suggested that we buy this home. My wife Stella told them that the house was too expensive and not our style of home. Lila and Talin suggested that we go look at it anyway and that it would be fun if we would move in

9

Exhibit _A_, Pg. 29

and be close to their new home. They had just purchased a new home off of the same street (Wedgewood Lane) in the same community. Lila's brother Rubik and wife Kathy Ohanians and Kathy's brother Vahe Hayrapetian with his wife Shake also lived in the community. A few weeks passed and Lila suggested to me that I have my wife, Stella, go look at the Wedgewood property. Stella went to look at the house just for fun on a weekend with Kathy Ohanians. A few days later Kathy Ohanians made arrangements to show me the house during lunch.

6. After viewing the house, I told Kathy that the house was nice but we wouldn't be able to afford it in that the payments would be too high. Kathy Ohanians said that we would be able to afford it, that if she could afford hers so could he. The payment would be around $4000.00 a month and she would be able to get the same kind of loan for us that her brother Vahe Hayrapetian and she had, which she told me was an interest only loan. After listening to her and understanding that as a real estate agent, she would know such things, I told her ok and that I would have my wife go look at the house.

7. I have reviewed the declaration of my wife, Stella Cimmarrusti and agree with the statements contained therein, adopt them as my own, and incorporate them by reference as though set forth in full.

8. Much later, after I began to notice that the principal balance of the refinance loan was increasing and we were attempting to modify the loan, I reviewed the loan documents and looked at the loan application that was included in a stack of loan documents. I did not review the loan application before the loan escrow closed on either the purchase or refinance loan. In reviewing the loan application for the first time, I noticed that my income stated on the application was highly inflated to show that Stella and I made in excess of $35,000 in monthly income. This statement is not true and is not the amount that I told Vahe Hayrapetian we made.

9. We would not have purchased the subject property had we known that the loan Kathy Ohanians and Vahe Hayrapetian were offering was an negative amortization loan. The minimum

10

monthly payments were slightly more than $4,000, however, if we were to make payments that would fully amortize the loan over the life of the loan, our payments would be in excess of $11,000.  Neither Kathy Ohanians nor Vahe Hayrapetian told us that our loans were negatively amortizing and if we made payments of slightly more than $4,000 per month that the principal balance of the loan would be increasing.  We would have continued making the monthly loan payments except that we were told by Aurora that we should stop making the monthly payments if we wanted to get a loan modification.  Aurora has noticed a trustee's sale through Quality Loan Services for June 2, 2009.  Although Aurora is servicing the loan, the deed of trust states that MERS is the beneficiary under the deed of trust as a representative of GMAC.  A true and correct copy of the Notice of Trustees Sale is attached hereto as Exhibit 2 and is incorporated herein by this reference as though set forth in full.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and executed this 30th day of May 2009.

Antonio Cimmarrusti, declarant

APP. FOR TRO, OSC RE PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

Preliminary Statement

Plaintiff are the owners of real property located at 3344 Wedgewood Lane, Burbank, California ("subject property").   GMAC, MERS, AURORA and QUALITY LOAN intend to conduct a trustee's sale on June 2, 2009 under the terms of a loan they obtained from defendant GMAC and MERS, which was assigned to AURORA for servicing and QUALITY LOAN is acting as trustee for the purpose of conducting the non-judicial foreclosure.

Plaintiffs were induced to purchase the subject property by defendant Kathy Ohanians and her family wherein she received a commission on for the sale of Plaintiffs Monrovia home and the purchase of the subject property.  When plaintiffs protested that they could not afford the month loan payments for the subject property, defendant Kathy Ohanians, a real estate agent perceived by the public to have and deemed to have superior knowledge in real estate, assured plaintiffs that they could.  Defendant Kathy Ohanians steered plaintiffs to her brother, Vahe Hayrapetian, Associate District Manager of GMAC, for the requisite financing for the purchase of the subject property. Plaintiffs would never have qualified for the loan to purchase the subject property but for the acts of GMAC through Vahe Hayrapetian.  Hayrapetian, working in concert with his sister, Kathy Ohanians, advised Plaintiffs that their loan payments would be about $4,000 per month.

GMAC's motivation was to generate as many loans as possible for sale to investors in the United States and abroad.  GMAC subsequently assigned the loan servicing to AURORA, however, the Deed of Trust provides that MERS is the beneficiary of the loan and acting on behalf of GMAC and its assigns.  AURORA's motivation was to purchase as many of the subprime and fraudulently generated loans at a discount to tap into the huge windfalls that would

12

be created by borrowers defaulting on loans secured by real property with huge amounts of equity.

Plaintiffs were victims of such sales effort. Plaintiffs were offered the subject property through Kathy Ohanians who steered plaintiffs to her brother, Hayrapetian acting for GMAC, who also sold a subsequent loan which plaintiffs obtained from GMAC to refinance the GMAC loan and HELOC loan in an effort to reduce their interest rate, which action was compelled by the original acts and conduct of GMAC, Hayrapetian, Ohanians and First Funders when they misled plaintiffs into purchasing the subject property.

Defendants GMAC and Hayrapetian failed to explain that Hayrapetian had a conflict of interest as he was paid a Yield Spread Premium ("YSP") fee to steer the plaintiffs away from a fixed interest rate or ARM fully amortized loan into a high adjustable interest rate negatively amortized loan that was not what Plaintiffs had agreed to undertake. Plaintiffs believe that Hayrapetian was paid a YSP fee tied to the amount by which the interest rate was increased from prevailing rates.

Plaintiffs were advised they would receive a 40 year interest only loan. After the loan closing the lender disclosed that it had mislead the plaintiffs and had really issued them an Adjustable Rate Mortgage (ARM) negative amortization loan, which was not what had been represented nor agreed upon. Hayrapetian did not meet with plaintiffs, plaintiffs did not sign any loan application and Hayrapetian greatly inflated plaintiffs' income and amount in their savings account. Plaintiffs would not have otherwise qualified for the loan or purchase of the subject property. Defendant Kathy Ohanians, sister of defendant Hayrapetian, working in concert and conspiracy with Hayrapetian and GMAC, convinced plaintiffs that they could afford the subject property when plaintiffs first told Ohanians that they did not care for the home and did not think

13

that they could afford to purchase the subject property.  During the loan process, plaintiffs did not personally interact with Hayrapetian, but provided a savings account statement to Ohanians at her request during the home purchasing process.  At both loan closings, Plaintiffs only met with the escrow officer who flipped through pages and told Plaintiffs' where to sign.

I

## AN INJUNCTION IS PROPER TO ENJOIN A TRUSTEE'S SALE BASED ON A DEED OF TRUST OBTAINED THROUGH PREDATORY LENDING PRACTICES HAVE STRIPPED HOMEOWNERS OF EQUITY AND LOSS OF THEIR HOMES

An injunction may be granted when it appears by the complaint that plaintiffs are entitled to the relief demanded and the relief, or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually. *Code Civ. Proc.* 526(a)(1); *Dingley v. Buckner* (1909) 11 Cal. App. 181, 183-184; *see Southern Christian Leadership Conference v. Al Malaikah Auditorium Co.* (1991) 230 Cal. App. 3d 207.

Business & Professions Code Sections 17200 et seq., and specifically Sections 17204 and 17535 permit injunctions to be sought by "any person acting for the interests of itself, its members, or the general public." See *Herr v. Nestle U.S.A., Inc.* (2003) 109 CA4th 779, 789, 135 CR2d 477, 484. The Legislature "intended ... to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur." *Barquis v. Merchants Collection Ass'n* (1972) 7 C3d 94, 111, 101 CR 745, 757; see also *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 C3d 197, 210, 197 CR 783, 790-791.

Courts can protect the public's right to be protected from fraud and deceit and may enter injunctive relief on that basis alone. *People ex rel. Mosk v. National Research Co. of Calif.*, supra, 201 CA2d at 771, 20 CR at 520.

14

APP. FOR TRO, OSC RE PRELIMINARY INJUNCTION

Exhibit _A_ , Pg. _34_

The courts' power to enjoin conduct violative of § 17200 is broad. "[I]t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited, since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery." *Motors, Inc. v. Times Mirror Co.* (1980) 102 CA3d 735, 740, 162 CR 543, 546 (quoting *People ex rel. Mosk v. National Research Co. of Calif.* (1962) 201 CA2d 765, 772, 20 CR 516, 521); accord, *People v. James* (1981) 122 CA3d 25, 35–36, 177 CR 110, 116—no prior finding of unfairness or illegality required.

"Predatory lending" is a term generally used to describe certain abusive and aggressive practices by residential lenders. The most commonly reported forms of abuse, which typically target borrowers with impaired credit, limited income, or a high debt ratio to income, groups such as the elderly, minorities, and low income borrowers, are: 1. providing borrowers with misleading information, manipulating borrowers through aggressive sales tactics, and taking advantage of borrower's lack of sophistication; 2. making loans that borrowers cannot afford to repay leading to foreclosure or bankruptcy; 3. refinancing loans repeatedly over a short period of time where new costs and fees are rolled into the loan at each refinancing with no benefit to the borrowers; 4. charging borrowers unnecessary and exorbitant interest rates and fees in loans including hidden prepayment penalties, large balloon payments, yield spread premiums, and expensive lump-sum credit insurance premiums; and 5. providing borrowers with good credit ratings subprime loans with interest rates higher than the borrowers should have received. *American Financial Services Association*, 23 Cal. Rptr. 3d 453 at 455; see also California Department of Real Estate "Avoiding Predatory Lending Bulletin" (and available at http://www.dre.ca.gov/predatory.htm).

15

Exhibit _A_, Pg. 35

Studies have shown a dramatic increase in the national rate of subprime lending. From 1993 to 1998, the Department of Housing and Urban Development ("HUD") compiled data establishing that the number of subprime loans in the United States increased tenfold from 80,000 to over 790,000. See Unequal Burden in New York: Income and Racial Disparities in Subprime Lending (April, 2000)

During the time period 1994-1999, HUD estimated the dollar volume of subprime loans increased from approximately $35 billion to over $160 billion. See Minorities, Seniors Should Cheer Predatory Lending Decision, Jan T. Chilton, San Francisco Daily Journal (February 8, 2005).

As a result of these predatory lending practices, it has been estimated that the United States loses over $9 billion per year. See A Report From the Coalition for Responsible Lending, Quantifying the Economic Cost of Predatory Lending (July 25, 2001, revised October 30, 2001), Eric Stein; (available at http:// www.responsiblelending.org/pdfs/Quant10-01.pdf).

The basis of these losses include excessive foreclosures, equity stripping, the charging of unreasonably high interest rates and fees and inflating income and asset statements in order to qualify the borrower for the loan.

Plaintiff has alleged a prima facie case of violation of *Bus. & Prof. Code* 17200 et seq. (Unfair Business Practices) based on the above violations and other conduct alleged in the complaint. In addition to its general power to enjoin under *Code Civ. Proc.* 526 (a)(1), the court is specifically authorized under *Bus. & Prof. Code* 17203 to enjoin the foreclosure as an unfair business practice.

II

16

APP. FOR TRO, OSC RE PRELIMINARY INJUNCTION

Exhibit _A_ , Pg 36

## DEFENDANTS HAVE ENGAGED IN UNFAIR, DECEPTIVE AND PREDATORY LENDING PRACTICES.

On February 2, 2005, the Office of the Comptroller of the Currency (the "OCC") issued residential real estate lending guidelines to restrict and/or limit national banks from becoming involved in predatory mortgage lending practices. These guidelines describe particular practices that the OCC deems inconsistent with sound mortgage lending practices. Specifically, the guidelines describe practices that may be conducive to abusive lending including, without limitation, equity stripping and fee packing, loan flipping, refinancing of special mortgages, and encouragement of loan defaults and which, accordingly, warrant a heightened degree of care by national lenders. See February 2, 2005 News Release (NR 2005-10), Comptroller of the Currency, Administrator of National Banks, a copy of which is attached hereto as Exhibit 3 and incorporated herein by this reference as though set forth in full. (The standards described in the OCC guidelines are enforceable against national lenders pursuant to Section 39 of the Federal Deposit Insurance Act [12 *U.S.C.A.* §§ 1831, p-1, et seq.] and the implementing process set forth in Part 30 of the OCC regulations, 12 *C.F.R.* Part 30.

The purpose of the Unfair Competition Law (UCL) is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. *Bus. & Prof.Code* § 17200 et seq.; *McKell v. WAMU* (2006) 142 Cal. App. 4th 1457.

In *McKell, supra,* Borrowers had alleged a violation of public policy. Specifically, they claimed that the practice violated the *federal* public policy of expanding opportunities for home ownership by reducing the cost of borrowing (e.g.,. Freddie Mac and Fannie Mae were created, and policies implemented, to expand opportunities for home ownership). The court rejected the lender's claim that the doctrine of judicial abstention precluded the court from getting involved in

17

setting prices for services. According to the court, the legislative determination as to the propriety of the lender's actions already had been made through applicable laws. The court further found unpersuasive lender's claim that the court should not interfere in the matter because its lending practices were heavily regulated. The court noted that the lender could point to no statute that specifically permitted its challenged practices.

Next, the court addressed whether Borrowers stated a UCL cause of action for unlawful business practices based on violation of the Real Estate Settlement Procedures Act ("RESPA"). RESPA requires that a lender conspicuously and clearly itemize all charges on the settlement statement. Section 8(b) of the Act, 12 U.S.C.A. § 2607, subd. (b), also prohibits *kickbacks* and unearned fees. The court recognized that there was a split in authority in the various circuits concerning whether a giver and a receiver were required for a violation. Here, if two parties were required for a violation, the lender could not have violated RESPA because it pocketed the extra money instead of passing it on to a third party. While the Fourth, Seventh, and Eight Circuits have held that RESPA does *not* prohibit mark-ups, the court found more persuasive the reasoning of the Second Circuit in *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49 (2d Cir. 2004) ("*Kruse*"). *Kruse* found the language in RESPA ambiguous concerning whether mark-ups are prohibited, so the court turned to HUD's interpretation as set forth in Regulation X. This regulation provides that a settlement service provider may *not* mark-up the cost of another provider's services. The court noted that under federal law, deference to an administrative agency's interpretation of a statute was *mandatory* under certain circumstances, and this was such a case. Recognizing that it was not bound by decisions of lower federal courts, the court of appeal adopted the *Kruse* court's reasoning as its own.

18

The court went on to reject the lender's claim that the UCL and other state law causes of action were *preempted* by RESPA and Regulation X or by the Home Owners' Loan Act ("HOLA"), 12 *U.S.C.A.* §§ 1461 et seq. The court noted that RESPA and Regulation X do not expressly preempt state law causes of action for their provisions. As for HOLA, Borrowers were not trying to use the UCL to enforce a state law purporting to regulate lending activities of federal savings associations. See, for example, *Lopez v. World Savings & Loan Assn.* (2003) 105 Cal. App. 4th 729. Rather, Borrowers were using the UCL to attempt to enforce general duties imposed on *all* businesses. In any event, noted the court, it had doubts as to whether HOLA (and § 560.2 of the regulations, 12 *C.F.R.* § 560.2) even applied in this case. RESPA was not part of HOLA. Furthermore, it was well settled law that a more recent and specific statute controls over an earlier and more general statute.

Defendants GMAC, Hayrapetian, Aurora have engaged in a pattern and practice of utilizing the non-judicial foreclosure procedures of the State of California to foreclose on properties when they are in violation of the Office of the Comptroller of Currency ("OCC") guidelines to prevent predatory residential mortgage lending practices, or standards designed to protect against predatory, abusive, unfair, or deceptive mortgage lending practices issued on February 2, 2005.

Plaintiffs were not required to supply any documents that would show that they had the income to make the payments called for by said loans. They were given an ARM loan that was far riskier than a fixed rate loan, which they would have been qualified for at a lower amount and which would have been readily understood. The business practices of the lenders in writing "no doc" loans were an invitation to unwitting borrowers to take on more financial obligations that they could possibly handle.

19

By reason of the predatory, abusive, unfair and deceptive lending practices of the defendants, the plaintiffs were fraudulently induced to purchase the subject property.  As a result the note and deed of trust were tainted as they had been produced by the fraudulent activities of the defendants.

Plaintiffs discovered after close of the refinance loan escrow that the loan was a negative amortization loan and attempted to modify the loan after learning that GMAC had transferred servicing of the loan to AURORA.  Plaintiffs were told by an AURORA representative that they should default on their loan in order to modify their loan terms.  Based on this representation and advice, plaintiffs ceased making their monthly loan payments and attempted to modify their existing loan. As a result of the non-payment of the loans the defendant began to threaten foreclosure of the first trust deed, have refused to modify their loan, and have set a trustee's sale of the subject property for June 2, 2009.

Defendants engaged in unlawful actions to justify their predatory, abusive, unfair and deceptive lending practices to generate fees and to tap into huge equity existing in the Los Angeles Area of approximately $500,000,000,000.

Plaintiffs were justified in relying on the expertise of the defendants in that they held themselves out as being capable of determining the size loan and terms that Plaintiffs would be able to manage without undue risk of loss. The defendants concealed the fact that the loan they were writing was a negative amortization loan after they had represented that it would be an interest only note and failed to consider a fixed rate loan because defendant Hayrapetian received a higher YSP for an ARM negative amortization loan. The defendants violated California Business and Professions Code 17500 by making untrue and misleading statements about the loan given to Plaintiffs and terms of the purchase.

20

Exhibit A , Pg. 40

Defendants, and each of them, have collaborated to engage and have engaged in predatory lending practice in violation of the Truth in Lending Act (TILA) 1601; Federal Regulation Z, 12 C.F.R. 22 and California Business and Professions Code 17500, and the OCC standards and guidelines issued on February 2, 2005.

Defendants failed to verify Plaintiffs' ability to repay the loans that they were offered, manufactured facts and figures that would show that Plaintiffs had the ability to repay the loan, mislead the Plaintiffs as to the terms and conditions of the loans, failed to fully disclose the terms and conditions of the loans in a manner that plaintiffs could understand and should have known to be able to make an informed decision about their ability to make the payments required. The fact that plaintiffs may have been provided a stack of documents, without any review of them with plaintiffs by Hayrapetian, that were not readily understood even by lawyers was not the requisite disclosures that should have been made to them.

Plaintiffs believe that defendants violated 15 U.S.C. 1639(h) in making loans and lowering their underwriting standards in order to write loans to minority borrowers that were financially unbearable and burdensome and would subject the Plaintiff to a high risk of losing their property by reason of a non-judicial foreclosure sale. Defendant GMAC's violation of 15 U.S.C 1639(h) makes the note written by defendant GMAC and assigned to AURORA for servicing subject to rescission and the payment of compensatory damages to Plaintiffs to make the Plaintiffs whole for damages suffered.

By reason of the fraudulent conduct of the defendants there is a strong likelihood of the Plaintiffs prevailing on their suit. Plaintiffs will seek leave of the court to prohibit any further actions to interfere with Plaintiffs' use and enjoyment of the property pending determination of this lawsuit.

APP. FOR TRO, OSC RE PRELIMINARY INJUNCTION

Because of the agent's fiduciary relationship, the question whether acts toward the principal are fraudulent or deceitful is not measured by the same legal standard as the acts of persons who deal at arm's length and who occupy no confidential or fiduciary relationship.

"Constructive fraud" consists of:

1. Any breach of duty that, without an actual fraudulent intent, the person in fault gains an advantage, or anyone claiming under him or her, by misleading another to his or her prejudice, or to the prejudice of anyone claiming under the misled person; or

2. Any such act or omission as the law specially declares to be fraudulent without respect to "actual fraud." *Civ. Code*, § 1573.

In an action for constructive fraud based on a representation by the fiduciary, it is not required that the fiduciary intend to defraud his principal or profit by his conduct. Further, there is a presumption of reliance by the principal. *Edmunds v. Valley Circle Estates* (1993) 16 Cal.App.4th 1290, 1299-1302. *Also see, Toedter v. Bradshaw* (1958) 164 Cal.App.2d 200, 208. As a general rule, a principal has a right to rely on the representations of a fiduciary. *Civ. Code,* §§ 1572 to 1573. *California Real Estate Loans, Inc. v. Wallace* (1993) 18 Cal.App.4th 1575, 1581; *Estate of Gump* (1991) 1 Cal.App.4th 582, 601; *Martin v. Martin* (1952) 110 Cal.App.2d 228, 233-234; and, there is no duty to investigate the truthfulness of a representation by a fiduciary or person with a confidential relationship. *Kane v. Mendenhall* (1936) 5 Cal.2d 749, 758-759 (failure to read document between principal and agent); *Sullivan v. Dunnigan* (1959) 171 Cal.App.2d 662, 668; *Gajanich v. Gregory* (1931) 116 Cal.App. 622, 633.

Constructive fraud comprises any act, omission, or concealment involving a breach of legal or equitable duty, trust, or confidence that results in damage to another even though the conduct is not otherwise fraudulent. *Estate of Gump, supra; Tackett v. Croonquist* (1966) 244

22

Cal.App.2d 572, 578 (real estate broker); *Efron v. Kalmanovitz* (1964) 226 Cal.App.2d 546, 559-560; *Santa Cruz County v. McLeod* (1961) 189 Cal.App.2d 222, 234-235. Most acts by an agent in breach of fiduciary duties constitute constructive fraud. *Pepitone v. Russo* (1976) 64 Cal.App.3d 685, 690; *Gold v. Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 373.

The failure of the fiduciary to disclose a material fact to the principal that might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud. *Civ. Code,* §§ 1573, subd. (1), 1710, subd. (3); *Byrum v. Brand* (1990) 219 Cal.App.3d 926, 937; *Stokes v. Henson* (1990) 217 Cal.App.3d 187, 197; *Also, see Black v. Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 367-368 (constructive fraud by nondisclosure by a dual agent). Where the fraud is based on a failure to disclose a material fact to the principal, it is not necessary to prove a false representation. *Byrum, supra* at 940-941.

Defendants GMAC and AURORA, acting through defendants Kathy Ohanians and Vahe Hayrapetian, owed plaintiffs a duty of utmost good faith and fair dealing when they acted in concert to arrange the purchase of the subject property by plaintiffs and arranged for the loan needed to purchase the subject property. The fiduciary duty was established and continued thereafter when plaintiffs sought to refinance the purchase money loan in an effort to consolidate the debt created by the purchase.

Defendants have violated the standards enunciated by the Office of Comptroller of the Currency that requires that banks must not become engaged in abusive, predatory, unfair, or deceptive practices, directly, indirectly through mortgage brokers or other intermediaries, or through purchased loans. As the OCC has previously indicated in guidance to national banks and in rulemaking proceedings (OCC Advisory Letters 2003–2 and 2003–3 (Feb. 21, 2003)),

23

Exhibit *A* , Pg. *43*

many of the abusive practices commonly associated with predatory mortgage lending, such as loan flipping and equity stripping, will involve conduct that likely violates the Federal Trade Commission Act's (FTC Act) prohibition against unfair or deceptive acts or practices (OCC Guidelines Issued February 2, 2005 attached hereto).

A preliminary injunction may be granted to preserve the status quo until a final determination of the merits of the action. *Continental Baking Co. v. Katz* (1968) 68 Cal. 2d 512; *People v. Black's Food Store* (1940) 16 Cal. 2d 59, 62. Defendants, acting through defendants Kathy Ohanians and Vahe Hayrapetian, without plaintiffs' knowledge or consent, inflated plaintiffs' income and assets in order to show that plaintiffs qualified for the loans and misrepresented the terms of the loan that they were interest only loans, when in fact they were negatively amortized loans. For all of the reasons set forth above, the status quo should be preserved until the court has adjudicated Plaintiffs claims on the merits.

<u>CONCLUSION</u>

Based on the foregoing facts and authority, plaintiffs respectfully request that this court issue a temporary restraining order and order to show cause re preliminary injunction restraining defendants from conducting the trustee's sale scheduled for June 2, 2009 and grant them such other and further relief as this court may deem proper.

Dated: May 31, 2009

WALTER R. LUOSTARI
Burlison & Luostari

Attorneys for plaintiffs Antonio
Cimmarrusti and Stella S.
Cimmarrusti

24

Exhibit A, Pg. 44

After Recording Return To:

GMAC Mortgage, LLC
100 Witmer Road
Horsham, PA 19044-0963
ATTN:  Records Management

———————————— [Space Above This Line For Recording Data] ————————————

Loan No. 598934404
MIN 1000375-0598934404-2

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A)      "Security Instrument" means this document, which is dated December 8,
2006      , together with all Riders to this document.
(B)      "Borrower" is

Antonio Cimmarrusti and Stella S. Cimmarrusti, husband and wife

Borrower is the trustor under this Security Instrument.
(C)      "Lender" is

GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation

Lender is a limited liability company            organized and existing under the
laws of Delaware                          . Lender's address is
100 Witmer Road, P.O. Box 963, Horsham, PA  19044

CALIFORNIA — Single Family – Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT Form 3005  1/01
*(Page 1 of 19)* 370147970          Initials: _____  L71
GMACM - CMS.0003.CA (0001)

# EXHIBIT 1

Exhibit A, Pg. 45

(D)     "Trustee" is
Executive Trustee Services, LLC

(E)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)     "Note" means the promissory note signed by Borrower and dated   December 8, 2006   . The Note states that Borrower owes Lender
One Million Six Hundred Eighty Thousand and 00/100

Dollars (U.S. $ 1,680,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
January 1, 2047

(G)     "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)     "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)     "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Biweekly Payment Rider | [ ] 1-4 Family Rider |
| [ ] Other(s) [specify] | [XX] Planned Unit Development Rider | |

(J)     "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)     "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)     "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)     "Escrow Items" means those items that are described in Section 3.

(N)     "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

CALIFORNIA-- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01
GMACM - CMS.0003.CA (0001) (Page 2 of 19)                        Initials: _____

Exhibit A, Pg. 46

(O)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)    "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)    "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. his Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County

of  Los Angeles

*[Type of Recording Jurisdiction]*

*[Name of Recording Jurisdiction]*

See Exhibit "A" attached hereto and made a part thereof

which currently has the address of
3344 Wedgewood Lane,

*[Street]*

Burbank             , California   91504                 ("Property Address"):

*[City]*                            *[Zip Code]*

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

CALIFORNIA— Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01

GMACM - CMS.0003.CA (0001) *(Page 3 of 19)*              Initials: _____

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other

LOAN NO: 598934404

CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01

GMACM - CMS.0003.CA (0001) *(Page 4 of 19)*                         Initials: _____

amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. . To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of

LOAN NO: 598934404

CALIFORNIA-- Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005   1/01
GMACM - CMS.0003.CA (0001) *(Page 5 of 19)*          Initials: _____

Exhibit A , Pg. 49

Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and

CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01
GMACM · CMS.0003.CA (0001) (Page 6 of 19)                    Initials: _____

floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or

LOAN NO: 598934404

CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005 1/01

GMACM - CMS.0003.CA (0001) (Page 7 of 19)          Initials: _____

Exhibit <u>A</u>, Pg. <u>51</u>

Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible, or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in

Exhibit A , Pg. 52

connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the

LOAN NO:  598934404
CALIFORNIA— Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005 1/01
GMACM - CMS.0003.CA (0001) (Page 9 of 19)            Initials: _____

amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until the Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01
GMACM - CMS.0003.CA (0001) *(Page 10 of 19)*          Initials: _____

Exhibit A , Pg. 54

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

LOAN NO: 598934404
CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01
GMACM - CMS.0003.CA (0001) (Page 11 of 19)                    Initials: _____

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

Exhibit A, Pg. 56

14.  **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.  **Notices.** All Notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16.  **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a

LOAN NO: 598934404
CALIFORNIA— Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01
GMACM - CMS.0003.CA (0001) *(Page 13 of 19)*          Initials: _____

Exhibit *A*, Pg. 51

prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon

CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005 1/01

GMACM - CMS.0003.CA (0001) *(Page 14 of 19)*                    Initials: _____

reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that

LOAN NO: 598934404
CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/01
GMACM - CMS.0003.CA (0001) (Page 15 of 19)            Initials: _____

adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.   Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more

Exhibit _A_, Pg. _60_

parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

[ THIS SPACE INTENTIONALLY LEFT BLANK ]

CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005   1/01
GMACM - CMS.0003.CA (0001) *(Page 17 of 19)*          Initials: _____

Exhibit A, Pg. 61

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Antonio Cimmarrusti                          -Borrower

_____ (Seal)
Stella S. Cimmarrusti                        -Borrower

_____ (Seal)
                                             -Borrower

_____ (Seal)
                                             -Borrower

Witnesses:

_____    _____

_____    _____

LOAN NO: 598934404
CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005  1/81
GMACM - CMS.0003.CA (0001) (Page 18 of 19)

Exhibit 4, Pg. 62

STATE OF CALIFORNIA

COUNTY OF

On _____  before me, _____
        Date                                    Name and Title of Officer (e.g. "Jane Doe", Notary Public")

personally appeared _____

_____
                    Name(s) of Signer(s)

☐  personally known to me

☐  (or proved to me on the basis of satisfactory
    evidence)

to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the
entity upon behalf of which the person(s) acted,
executed the instrument.

Witness my hand and official seal.

_____

Place Notary Seal Above                 Signature of Notary Public

LOAN NO: 598934404
CALIFORNIA-- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005
GMACM - CMS.0003.CA (0606) *(Page 19 of 19)*          Initials: _____

Exhibit _A_, Pg. 63

# GMAC
## Mortgage

Lender:    GMAC Mortgage, LLC f/k/a GMAC
           Mortgage Corporation

Borrower(s):  Antonio Cimmarrusti
              Stella S. Cimmarrusti

Loan Number:    598934404

Closing Date:   12/08/2006

Loan Amount:  $1,680,000.00

Property Address: 3344 Wedgewood Lane,
                  Burbank, CA 91504

## PAYMENT SCHEDULE

We appreciate the opportunity to help you with your home financing.  The following is your mortgage payment schedule.

| | | |
|---|---|---|
| Principal & Interest | $ | 5,087.48 |
| Total Monthly Payment | $ | 5,087.48 |

The information provided for escrowed items are estimated. Once our Servicing Center performs their final review, your payment will be adjusted to show the actual amounts to be collected.  Any changes will be reflected on your mortgage account statement.

Your payments are due on the first day of every month beginning  February  1, 2007

Payments should be sent to:

          GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation
          P.O. Box 780, Waterloo, IA 50702-0780, ATTN: Payment Processing

Receipt is hereby acknowledged of a duplicate hereof.

| | | |
|---|---|---|
| Antonio Cimmarrusti | Borrower | Date |
| Stella S. Cimmarrusti | Borrower | Date |
| | Borrower | Date |
| | Borrower | Date |

GMACM - ACM.0318 (0306)  370147971

Exhibit A, Pg. 64

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this        8th        day of
December        , 2006   , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the
same date, given by the undersigned (the "Borrower") to secure Borrower's Note to

GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation

(the "Lender") of the same date and covering the Property described in the Security Instrument
and located at:

3344 Wedgewood Lane
Burbank, CA 91504
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together
with other such parcels and certain common areas and facilities, as described in

Covenants, Conditions and Restrictions of Record

(the "Declaration"). The Property is a part of a planned unit development known as

Burbank Hills HOA
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners
Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the
PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii)
articles of incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally
accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is
satisfactory to Lender and which provides insurance coverage in the amounts (including
deductible levels), for the periods, and against loss by fire, hazards included within the term
"extended coverage," and any other hazards, including, but not limited to, earthquakes and
floods, for which Lender requires insurance, then:

LOAN NO: 598934404
MULTISTATE PUD RIDER - Single Family -
Fannie Mae/Freddie Mac Uniform Instrument Form 3150 1/01
Page 1 of 3    370147962        Initials: _____
GMACM - CRM.0044.PUD (0411)

(i)  Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and

(ii)  Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C.  Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D.  Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E.  Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i)  the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii)  any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender;

(iii)  termination of professional management and assumption of self-management of the Owners Association; or

(iv)  any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F.  Remedies. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

LOAN NO: 598934404
MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac Uniform Instrument Form 3150 1/01
GMACM - CRM.0044.PUD (0411)        Page 2 of 3              Initials: _____

Exhibit *A*, Pg. 66

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

Antonio Cimmarrusti _____ (Seal)
                                                    -Borrower

_____ (Seal)
Stella S. Cimmarrusti                               -Borrower

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                                    -Borrower

Exhibit _A_, Pg. _61_

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this         8th         day of
December               ,  2006    ,  and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the
"Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the
Borrower's Adjustable Rate Note (the "Note") to

GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation      (the

"Lender") of the same date and covering the property described in the Security Instrument and
located at:

3344 Wedgewood Lane, Burbank, CA 91504
*[Property Address]*

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE
INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A
LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN
INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY
COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED,
BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in
the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2. INTEREST RATE
(A) Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been
paid. I will pay interest at a yearly rate of    2.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after
any default described in Section 7(B) of the Note.
(B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of  February,     2007
and on that day every month thereafter. Each date on which my interest rate could change is
called an "Interest Rate Change Date." The new rate of interest will become effective on each
Interest Rate Change Date.

LOAN NO: 598934404
MULTISTATE 1 MO. ARM RIDER – (12-MTA Index) 4/05   Rev. 8/06
*(Page 1 of 5)*  370147964
GMACM-CRM.1885 (0608)                          Initials: _____

Exhibit *A*, Pg. 68

(C)  The Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates H.15 (519)" (the "Monthly Yields"). The "Twelve-Month Average" is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The published Index that is effective on the 15th day before the applicable Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, or is no longer posted through electronic transmission, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D)  Calculation of Interest Rate Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Three  and 125/1000                             percentage points ( 3.125%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Change Date. My interest rate will never be greater than  9.956%.

## 3. PAYMENTS

(A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on February,        2007  . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 1, 2047        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  P.O. Box 780, Waterloo, IA 50702-0780, ATTN: Payment Processing or at a different place if required by the Note Holder.

(B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $  5,087.48 This amount may change.

(C)  Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of        February   2008  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

LOAN NO: 598934404

MULTISTATE 1 MO. ARM RIDER – (12-MTA Index) 4/05 Rev. 8/06
GMACM-CRM.1885 (0608)        (Page 2 of 5)        Initials: _____

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment". The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new required monthly payment will be lesser of the Limited Payment and the Full Payment. I also have the option each month to pay more than the Limited Payment up to and including the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to One Hundred Ten percent ( 110 %) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the current interest rate.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

LOAN NO: 598934404

MULTISTATE 1 MO. ARM RIDER – (12-MTA Index) 4/05  Rev. 8/06

GMACM-CRM.1885 (0608)          *(Page 3 of 5)*          Initials: _____

Exhibit *A*, Pg. *70*

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(This space left intentionally blank)

LOAN NO:  598934404
MULTISTATE 1 MO. ARM RIDER -- (12-MTA Index) 4/05  Rev. 8/06
GMACM-CRM.1885 (0608)        (Page 4 of 5)        Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Antonio Cimmarrusti                              -Borrower


_____ (Seal)
Stella S. Cimmarrusti                            -Borrower


_____ (Seal)
                                                 -Borrower


_____ (Seal)
                                                 -Borrower


LOAN NO: 598934404
MULTISTATE 1 MO. ARM RIDER -- (12-MTA Index) 4/05   Rev. 8/06
GMACM-CRM.1885 (0608)      (Page 5 of 5)      Initials: _____

**GMAC**
**Mortgage**

# NAME AFFIDAVIT

DATE:  12/08/2006

LOAN NUMBER:  598934404

BORROWER:  Antonio Cimmarrusti

I,  Antonio Cimmarrusti                                                                , certify that I am
one and the same person as    Anthony Cimmarrusti; Tony Cimmarrusti; A. Cimmarrusti

_____                    _____    __12/08/2006__
Antonio Cimmarrusti                                        Borrower          Date

Subscribed and sworn (affirmed) before me, a Notary Public

this                              day of

_____
Notary Public in and for

the State of    California
County of    Los Angeles

My Commission Expires:

GMACM - ACM.0301 (9410)

370147945

**GMAC**
**Mortgage**

# NAME AFFIDAVIT

DATE: 12/08/2006

LOAN NUMBER: 598934404

BORROWER: Stella S. Cimmarrusti

I, Stella S. Cimmarrusti                                                    , certify that I am
one and the same person as   Stella Cimmarrusti; Stella S. Calabrese; Stella Calabrese;
                OR:  S. S. Cimmarrusri; S. Cimmarrusti

_Stella S. Cimmarrusti_ _____     Borrower     _12/08/2006_
                                                              Date

Subscribed and sworn (affirmed) before me, a Notary Public

this                     day of

_____
Notary Public in and for

the State of    California
County of    Los Angeles

My Commission Expires:

GMACM - ACM.0301 (9410)

370147946

Exhibit _A_, Pg. 74

LENDER: GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation
BORROWER(S): Antonio Cimmarrusti
             Stella S. Cimmarrusti

PROPERTY ADDRESS: 3344 Wedgewood Lane, Burbank, CA 91504
LOAN NO.: 598934404

## ERROR AND OMISSIONS / COMPLIANCE AGREEMENT

STATE OF California
COUNTY OF Los Angeles

The undersigned borrower(s) for and in consideration of the above-referenced Lender this date funding the closing of this loan agrees, if requested by Lender or Closing Agent for Lender, to fully cooperate and adjust for clerical errors, any or all loan closing documentation if deemed necessary or desirable in the reasonable discretion of Lender to enable Lender to sell, convey, seek guaranty or market said loan to any entity, including but not limited to an investor, Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, Federal Housing Authority or the Department of Veterans Affairs.

The undersigned borrower(s) do hereby so agree and covenant in order to assure that this loan documentation executed this date will conform and be acceptable in the marketplace in the instance of transfer, sale or conveyance by Lender of its interest in and to said loan documentation.

DATED effective this         8th         day of         December         , 2006

| | |
|---|---|
| Antonio Cimmarrusti          (Borrower) | Stella S. Cimmarrusti          (Borrower) |
| (Borrower) | (Borrower) |

Sworn to and subscribed before me this         8th         day of         December  ,  2006 .

_____
(Notary Public)

My Commission Expires:

GMACM - ACM.0068.EOCA (9408)
    370147947

Exhibit A, Pg. 75

Recording requested by:
Quality Loan Service Corp.

When recorded mail to:
Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101

---

TS # CA-09-241587-CL          Loan # 0124697764                    SPACE ABOVE THIS LINE FOR RECORDER'S USE

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 12/8/2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 to the Financial code and authorized to do business in this state, will be held by duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

**BENEFICIARY MAY ELECT TO BID LESS THAN THE TOTAL AMOUNT DUE.**

Trustor(s):    **ANTONIO CIMMARRUSTI AND STELLA S. CIMMARRUSTI, HUSBAND AND WIFE**
Recorded:    12/19/2006 as Instrument No. 06-2817127 in book xxx, page xxx of Official Records in the office of the Recorder of LOS ANGELES County, California;

Date of Sale:  6/2/2009 at 10:30 AM
Place of Sale:  At the West side of the Los Angeles County Courthouse, directly facing Norwalk Blvd., 12720 Norwalk Blvd., Norwalk, CA.
Amount of unpaid balance and other charges: $1,861,527.90
The purported property address is:    3344 WEDGEWOOD LN
                               BURBANK, CA 91504

Assessors Parcel No. 2471-052-030

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

**If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.**

Date: 5/12/2009              Quality Loan Service Corp.
                              2141 5th Avenue
                              San Diego, CA 92101
                              619-645-7711 For NON-SALE information only
                              Sale Line: 714-730-2727 or Login to: www.fidelityasap.com
                              Reinstatement Line: 619-645-7711

---

Quality Loan Service, Corp.

# EXHIBIT 2

Exhibit A, Pg. 76

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holder's rights against the real property only.

**THIS NOTICE IS SENT FOR THE PURPOSE OF COLLECTING A DEBT. THIS FIRM IS ATTEMPTING TO COLLECT A DEBT ON BEHALF OF THE HOLDER AND OWNER OF THE NOTE. ANY INFORMATION OBTAINED BY OR PROVIDED TO THIS FIRM OR THE CREDITOR WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

# Important Notice Regarding
# Alternatives to Foreclosure

If you would like information regarding the options available,
Please call, email, or fax us:
**Home Retention Department**
**877-88MYQLS (877-886-9757)**
**Email: Homeretention@qualityloan.com**
**Fax: (619) 568-3574**

Please fax or email the attached financial form(s) to expedite our ability to help you process your request.

If you would like to obtain an exact figure as to the amounts needed to cure the default or pay the loan in full, forward your request for reinstatement figures and/or payoff quotes to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
Fax (619) 568-3599
or call:
Payoff and Reinstatement Department - 877-REINST8 (877-734-6788)

You may wish to consult a credit-counseling agency to assist you. The Department of Housing and Urban Development (HUD) can provide you with the name and address of the local HUD approved counseling agency by calling their toll-free hotline at (800) 569-4287.

**Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure. Be sure to notify Quality Loan Service or your lender in the event your property is listed or under contract for sale or the foreclosure may take place notwithstanding your expected sale.**

THIS NOTICE IS SENT FOR THE PURPOSE OF COLLECTING A DEBT. THIS FIRM IS ATTEMPTING TO COLLECT A DEBT ON BEHALF OF THE HOLDER AND OWNER OF THE NOTE. ANY INFORMATION OBTAINED BY OR PROVIDED TO THIS FIRM OR THE CREDITOR WILL BE USED FOR THAT PURPOSE.

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101



7103 9628 5941 3374 8848



CA-09-241687-CL
ANTONIO CIMMARRUSTI
3344 WEDGEWOOD LN
BURBANK, CA 91504

# Important Notice Regarding
## Alternatives to Foreclosure

### THERE ARE ALTERNATIVES TO FORECLOSURE, BUT YOU MUST TAKE *IMMEDIATE ACTION.*

Hay alternativas para llevar acabo la ejecucion de hipoteca (foreclosure). Su prestador esta altamente interesado en discutir las opciones que le podra ayudar evitar la ejecucion de su hipoteca (foreclosure), pero necesita llamar a nuestra oficina inmediatamente para poder ayudarle con cualquier pregunta que tenga al respecto. Por favor llame a Quality Loan Service Corporation, el numero de telefono es 877-886-9757. Tenemos personas que hablan espanol y capacitadas para brindarle ayuda con su prestamo.

Your lender is very interested in discussing options that may help you avoid foreclosure, **BUT YOU MUST TAKE IMMEDIATE ACTION AND CALL TODAY.** Your lender may require certain financial information (attached) and may require access to the property to determine the property's value prior to qualifying you for these programs.

## (continued on reverse)



# Important Notice Regarding
# <u>Alternatives to Foreclosure</u>

If you would like information regarding the options available,
Please call, email, or fax us:
**Home Retention Department**
**(866) 645-7711 ext.1706**
**Email:** Homeretention@qualityloan.com
**Fax: (619) 568-3574**

Please fax or email the attached financial form(s) to expedite our ability to help you process your request.

If you would like to obtain an exact figure as to the amounts needed to cure the default or pay the loan in
full, forward your request for reinstatement figures and/or payoff quotes to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
Fax (619) 568-3599
or call:
Payoff and Reinstatement Department - (866) 645-7711
Extension 3709

You may wish to consult a credit-counseling agency to assist you. The Department of Housing and Urban
Development (HUD) can provide you with the name and address of the local HUD approved counseling agency by
calling their toll-free hotline at (800) 569-4287.

**Notwithstanding the fact that your property is in foreclosure, you may offer your
property for sale provided the sale is concluded prior to the conclusion of the
foreclosure. <u>Be sure to notify Quality Loan Service or your lender in the event your
property is listed or under contract for sale or the foreclosure may take place
notwithstanding your expected sale.</u>**

**THIS NOTICE IS SENT FOR THE PURPOSE OF COLLECTING A DEBT. THIS FIRM IS
ATTEMPTING TO COLLECT A DEBT ON BEHALF OF THE HOLDER AND OWNER OF THE
NOTE. ANY INFORMATION OBTAINED BY OR PROVIDED TO THIS FIRM OR THE
CREDITOR WILL BE USED FOR THAT PURPOSE.**



# NEWS RELEASE

---

**Comptroller of the Currency**
**Administrator of National Banks**                    **NR 2005-10**

---

EXHIBIT **3**

Exhibit A, Pg. 81

FOR IMMEDIATE RELEASE                    Contact: Kevin Mukri
February 2, 2005                         ☎ - (20...

## OCC Issues Guidelines to Prevent Predatory Residential Mortgage Lending Practices

WASHINGTON, DC -- The Office of the Comptroller of the Currency (OCC) today issued residential real estate lending standards as an additional step to protect against national banks becoming involved in predatory, abusive, unfair, or deceptive residential mortgage lending practices.

"The OCC is committed to ensuring that abusive lending practices do not gain a foothold in the national banking system," said Julie L. Williams, acting Comptroller of the Currency.

The new guidelines incorporate key provisions and central principles of the OCC's February, 2003 advisory letters alerting national banks to practices that may be considered predatory or abusive and advising national banks on measures to avoid such practices. The advisories addressed national banks' mortgage origination activity, as well as purchases of loans and use of third-party brokers to conduct mortgage lending. National banks are expected to implement anti-predatory lending standards consistent with and appropriate to the size and complexity of the bank and the nature and size of its lending activities.

In January 2004, the OCC added a regulatory prohibition on making mortgage loans based predominantly on the bank's realization of foreclosure or liquidation value of the collateral, without regard to the borrower's ability to repay the loan according to its terms—a prohibition that addresses a central characteristic of predatory lending. In that same rulemaking, the OCC also added provisions prohibiting banks from engaging in unfair or deceptive practices under the Federal Trade Commission Act.

The guidelines issued today for residential mortgage lending standards describe particular practices that are inconsistent with sound mortgage lending practices. They describe other practices that may be conducive to abusive lending, depending on the circumstances, and which, accordingly, warrant a heightened degree of care by bankers.

"The guidelines focus on the substance of a bank's activities and practices," said acting Comptroller Williams, "not on the creation of another set of bank policies."

The standards described in the guidelines are enforceable pursuant to section 39 of the Federal Deposit Insurance Act and the implementing process set forth in part 30 of the OCC's regulations. If the OCC believes a bank's practices fail to meet the standards in the guidelines, the OCC may require submission of a corrective plan by the bank. If the national bank fails to submit a plan, or to comply with it, the OCC may issue a cease and desist order against the bank. Orders are formal, public documents, and they may be enforced in district court or through the assessment of civil money penalties.

The guidelines take effect 60 days after their publication in the *Federal Register*.

# # #

*The Office of the Comptroller of the Currency was created by Congress to charter national banks, to oversee a*

nationwide system of banking institutions, and to assure that national banks are safe and sound, competitive and profitable, and capable of serving in the best possible manner the banking needs of their customers.

5/21/2009 3:50 PM

Exhibit A, Pg. 83

Case 2:09-cv-04280-SJO-SS   Document 1   Filed 06/15/09   Page 85 of 93   Page ID #:85

meetings held on July 1, 2004, and August 12, 2004, respectively, where this action was deliberated were public meetings widely publicized throughout the California raisin industry. All interested persons were invited to attend the meetings and participate in the industry's deliberations.

This final rule imposes no additional reporting or recordkeeping requirements on either small or large raisin handlers. As with all Federal marketing order programs, reports and forms are periodically reviewed to reduce information requirements and duplication by industry and public sector agencies. Finally, USDA has not identified any relevant Federal rules that duplicate, overlap, or conflict with this rule.

A proposed rule concerning this action was published in the Federal Register on December 10, 2004 (69 FR 71753). Copies of the proposed rule were also mailed or sent via facsimile to all raisin handlers. Finally, the proposed rule was made available through the Internet by USDA and the Office of the Federal Register. A 10-day comment period ending December 20, 2004, was provided to allow interested persons to respond to the proposal.

One comment was received in reference to the proposal. The comment did not address anything specific to the proposed rule. No changes are made to the final rule in response to the comment.

A small business guide on complying with fruit, vegetable, and specialty crop marketing agreements and orders may be viewed at: *http://www.ams.usda.gov/fv/moab.html*. Any questions about the compliance guide should be sent to Jay Guerber at the previously mentioned address in the FOR FURTHER INFORMATION CONTACT section.

After consideration of all relevant material presented, including the recommendation and information submitted by the Committee and other available information, the comment received, it is hereby found that this rule, as hereinafter set forth, will tend to effectuate the declared policy of the Act.

It is further found that good cause exists for not postponing the effective date of this rule until 30 days after publication in the Federal Register (5 U.S.C. 553) because the marketing order requires that the rate of assessment for each crop year apply to assessable raisins handled during such period. The crop year began on August 1, 2004, and the harvest is completed. The Committee needs additional revenues to meet its ongoing expenses. Further, handlers are aware of this rule, which

was recommended at a public meeting. Also, a 10-day comment period was provided for in the proposed rule, and no comments from the California raisin industry were received.

## List of Subjects in 7 CFR Part 989

Grapes, Marketing agreements, Raisins, Reporting and recordkeeping requirements.

■ For the reasons set forth in the preamble, 7 CFR part 989 is amended as follows:

## PART 989—RAISINS PRODUCED FROM GRAPES GROWN IN CALIFORNIA

■ 1. The authority citation for 7 CFR part 989 continues to read as follows:

Authority: 7 U.S.C. 601–674.

■ 2. Section 989.347 is revised to read as follows:

## § 989.347  Assessment rate.

On and after August 1, 2004, an assessment rate of $11.00 per ton is established for assessable raisins produced from grapes grown in California.

Dated: February 1, 2005.
Kenneth C. Clayton,
*Acting Administrator, Agricultural Marketing Service.*
[FR Doc. 05–2217 Filed 2–4–05; 8:45 am]
BILLING CODE 3410–02–P

## DEPARTMENT OF THE TREASURY

### Office of the Comptroller of the Currency

**12 CFR Part 30**

[Docket No. 05–02]

RIN 1557–AC93

### OCC Guidelines Establishing Standards for Residential Mortgage Lending Practices

**AGENCY:** Office of the Comptroller of the Currency, Treasury.

**ACTION:** Appendix to regulations; final guidelines.

**SUMMARY:** The Office of the Comptroller of the Currency (OCC) is issuing, as an appendix to part 30 of its regulations, guidelines concerning the residential mortgage lending practices of national banks and their operating subsidiaries (Guidelines) as a further step to protect against national bank involvement in predatory, abusive, unfair, or deceptive residential mortgage lending practices. The Guidelines describe particular practices inconsistent with sound

residential mortgage lending practices. They also describe other terms and practices that may be conducive to predatory, abusive, unfair, or deceptive lending practices, depending on the circumstances, and which, accordingly, warrant a heightened degree of care by lenders. In addition, the Guidelines address the steps that banks should take to mitigate risks associated with their purchase of residential mortgage loans and use of mortgage brokers to originate loans. The Guidelines focus on the substance of activities and practices, not on the creation of policies. The standards contained in the Guidelines are enforceable pursuant to section 39 of the Federal Deposit Insurance Act and the implementing process set forth in part 30 of the OCC's regulations.

**EFFECTIVE DATE:** April 8, 2005.

**FOR FURTHER INFORMATION CONTACT:** For questions concerning the Guidelines, contact Michael Bylsma, Director, Community and Consumer Law Division, (202) 874–5750, Michele Meyer, Special Counsel, Legislative & Regulatory Activities Division, (202) 874–5090, or Rick Freer, National Bank Examiner, Compliance, (202) 874–4428, 250 E Street, SW., Washington, DC 20219.

**SUPPLEMENTARY INFORMATION:**

### Background

National banks are authorized by statute to engage in real estate lending activities, subject to the requirements of Federal law,[1] and national banks' real estate lending is closely supervised and comprehensively regulated under a regulatory framework that includes a wide variety of Federal laws and regulations designed to ensure the protection of consumers of banks' residential mortgage products and services.[2]

Fair treatment of customers is fundamental to sound banking practices

---

[1] 12 U.S.C. 371(a); and see 12 CFR part 34 (OCC rules governing real estate lending and appraisals implementing 12 U.S.C. 1828(o)).

[2] Federal consumer protection laws and regulations that apply with respect to the residential real estate lending activities of national banks and their operating subsidiaries include: the Federal Trade Commission Act, 15 U.S.C. 41 et seq.; the Truth in Lending Act, 15 U.S.C. 1601 et seq.; the Home Ownership and Equity Protection Act, 15 U.S.C. 1639 et seq.; the Fair Housing Act, 42 U.S.C. 3601 et seq.; the Equal Credit Opportunity Act, 15 U.S.C. 1691 et seq.; the Real Estate Settlement Procedures Act, 12 U.S.C. 1261 et seq.; the Flood Disaster Protection Act, 42 U.S.C. 4001 et seq.; the Home Mortgage Disclosure Act, 12 U.S.C. 2801 et seq.; the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq., as recently amended by the Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108–159, 111 Stat. 1952; the Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq.; and the privacy provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. 6801 et seq.

**6330**   Federal Register / Vol. 70, No. 24 / Monday, February 7, 2005 / Rules and Regulations

and the OCC has taken a number of measures in recent years to assure that the lending practices of national banks reflect that standard. In particular, in February, 2003, we issued two advisory letters alerting national banks to practices that may be considered predatory or abusive and advising national banks on measures to avoid such practices. The advisories addressed national banks' mortgage origination activity, as well as purchases of loans and use of third-party brokers to conduct mortgage lending.[3] In January, 2004, we added to our rules an express prohibition on making mortgage loans based predominantly on the bank's realization of foreclosure or liquidation value of the collateral, without regard to the borrower's ability to repay the loan according to its terms, a prohibition that goes to the heart of predatory lending. In that same rulemaking, we also added provisions prohibiting banks from engaging in unfair or deceptive practices within the meaning of section 5 of the Federal Trade Commission Act, 15 U.S.C. 45.[4] In addition to establishing standards by regulation and in guidance, our overall approach includes taking prompt enforcement action to remedy abusive practices if we find that they have occurred.[5]

In order to enhance our ability to apply the guidance described in our February, 2003 advisory letters, we are now adopting the core elements of that guidance in the form of guidelines for residential mortgage lending standards, in a new Appendix C to part 30 of our regulations. These standards further the OCC's goal of ensuring that national banks and their operating subsidiaries are not involved directly or indirectly through loans that they purchase or make through intermediaries, in predatory or abusive residential mortgage lending practices. The Guidelines incorporate and implement the principles of, but do not replace, the February, 2003 advisory letters. The advisories remain in effect as

supervisory guidance that provides supplemental context and explanation of the issues addressed in these Guidelines. Like the advisories, the Guidelines apply to national banks and, pursuant to OCC regulations, to their operating subsidiaries.[6] The Guidelines focus on the substance of activities and practices, not on the creation of policies. The Guidelines are enforceable pursuant to the process provided in Section 39 of the Federal Deposit Insurance Act (FDIA) and part 30.

### Enforcement of the Guidelines

The OCC is issuing these Guidelines pursuant to Section 39 of the FDIA.[7] Section 39 authorizes the OCC to prescribe safety and soundness standards in the form either of a regulation or guidelines. These standards currently include, among others, operational and managerial standards for insured depository institutions that relate to internal controls, information systems, and audit systems; loan documentation; credit underwriting; interest rate exposure; and asset growth. Section 39 also provides, without qualification, that "each appropriate Federal banking agency" may prescribe "such other operational and managerial standards" as it "determines to be appropriate."

Section 39 prescribes different consequences depending on whether the standards it authorizes are issued by regulation or guidelines. Pursuant to Section 39, if a national bank fails to meet a standard prescribed by *regulation*, the OCC *must* require it to submit a plan specifying the steps it will take to comply with the standard. If a national bank fails to meet a standard prescribed by *guideline*, the OCC has the discretion to decide whether to require the submission of such a plan.[8] Issuing these residential mortgage lending practices standards by guideline rather than by regulation provides the OCC with the flexibility to pursue the course of action that is most appropriate, taking into consideration the specific circumstances of a national bank's noncompliance with one or more

standards, and the bank's self-corrective and remedial responses.

The Guidelines incorporate key provisions of the February, 2003 advisory letters and describe certain practices the OCC believes are inconsistent with sound residential mortgage lending practices. They also describe other terms and practices that may be conducive to predatory, abusive, unfair, or deceptive lending, and which, accordingly, warrant a heightened degree of care by lenders. The Guidelines thus incorporate the central principles and considerations contained in the February, 2003 advisories into a framework that specifically provides for their enforcement on a case-by-case basis under the framework provided by Section 39 and part 30 of our regulations.

The enforcement remedies prescribed by Section 39 are implemented in procedural rules contained in part 30 of the OCC's rules. Under these provisions, the OCC may initiate the part 30 process when we determine, by examination or otherwise, that a national bank has failed to meet the standards set forth in the Guidelines.[9] Upon making that determination, we may request, through a supervisory letter or in a report of examination, that the national bank submit a compliance plan to the OCC detailing the steps the bank will take to correct the deficiencies and the time within which it will take those steps. This request is termed a Notice of Deficiency. Upon receiving a Notice of Deficiency from the OCC, the national bank must submit a compliance plan to the OCC for approval within 30 days.

If a national bank fails to submit an acceptable compliance plan, or fails materially to comply with a compliance plan approved by the OCC, the OCC may issue a Notice of Intent to issue an Order pursuant to Section 39 (Notice of Intent). The bank then has 14 days to respond to the Notice of Intent. After considering the bank's response, the OCC may issue the order, decide not to issue the order, or seek additional information from the bank before making a final decision. Alternatively, the OCC may issue an order without providing the bank with a Notice of Intent. In such a case, the bank may appeal after-the-fact to the OCC and the OCC has 60 days to consider the appeal and render a final decision. When the OCC issues an order, a bank is deemed to be in non-compliance with part 30.

---

[3] OCC Advisory Letter 2003–2, "Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices" (Feb. 21, 2003) and OCC Advisory Letter 2003–3, "Avoiding Predatory and Abusive Lending Practices in Brokered and Purchased Loans" (Feb. 21, 2003).

[4] 69 FR at 1917 (to be codified at 12 CFR 34.3). Through amendments to other provisions of our rules, both the anti-predatory lending standard and the prohibition against unfair or deceptive practices also apply to national banks' non-real estate lending. A number of commenters on these amendments lauded the content of the Advisory Letters but questioned their effectiveness.

[5] A listing of enforcement actions taken recently by the OCC is available on our Web site in the "Popular FOIA Requests" section at *http://www.occ.treas.gov/foia/foiadocs.htm.*

[6] 12 CFR 5.34(e) (operating subsidiaries may conduct only those activities permissible for the parent national bank; operating subsidiaries' authorized activities are subject to the same terms and conditions as apply to the parent bank).

[7] 12 U.S.C. 1831p–1. Section 39 was enacted as part of the Federal Deposit Insurance Corporation Improvement Act of 1991, Public Law 102–242, section 132(a), 105 Stat. 2236, 2267–70 (Dec. 19, 1991) (FDICIA).

[8] See 12 U.S.C. 1831p–1(e)(1)(A)(ii) and (ii). In either case, however, the statute authorizes the issuance of an order and the subsequent enforcement of that order in court, independent of any other enforcement action that may be available in a particular case.

[9] The procedures governing the determination and notification of failure to satisfy a standard prescribed pursuant to Section 39, the filing and review of compliance plans, and the issuance, if necessary, of orders appear in our regulations at 12 CFR 30.3, 30.4, and 30.5, respectively.

Case 2:09-cv-04280-SJO-SS   Document 1   Filed 06/15/09   Page 87 of 93   Page ID #:87

Orders are formal, public documents, and they may be enforced in district court or through the assessment of civil money penalties under 12 U.S.C. 1818.

**Description of the OCC's Residential Mortgage Lending Practices Guidelines**

The Guidelines consist of three parts. Part I provides an introduction to the Guidelines and explains their scope and application. Part II sets forth general standards for residential mortgage lending practices. Part III describes the implementation of those standards. We have also made technical conforming amendments to the part 30 regulations to add references to new Appendix C, which contains the Guidelines, where appropriate.

*Part I: Introduction*

Part I describes the purpose of the Guidelines, which is to protect against involvement by national banks and their operating subsidiaries, either directly or through loans that they purchase or make through intermediaries, in predatory or abusive residential mortgage lending practices that are injurious to bank customers and that expose the bank to credit, compliance, reputation, and other risks associated with abusive lending practices. The Guidelines apply to residential mortgage lending by national banks, federal branches and agencies of foreign banks, and operating subsidiaries of such entities, except for brokers, dealers, persons providing insurance, investment companies, and investment advisers, all of which are functionally regulated pursuant to various provisions of law. For purposes of the Guidelines, a residential mortgage loan is any loan or other extension of credit made to one or more individuals for personal, family, or household purposes and secured by an owner-occupied, 1–4 family residential dwelling, including a cooperative unit or mobile home.

The Guidelines are enforceable, pursuant to Section 39 of the FDIA and part 30 of our rules, as we have described. However, as set forth in Part I, nothing in the Guidelines in any way limits the authority of the OCC to address unsafe or unsound practices or conditions, unfair or deceptive practices, or other violations of law. Thus, for example, a bank's failure to comply with the standards set forth in these Guidelines also may be actionable under section 8 of the FDIA if the failure constitutes an unsafe or unsound practice, or under section 5 of the Federal Trade Commission Act if it is an unfair or deceptive practice.

*Part II: Standards for Residential Mortgage Lending Practices*

Part II of the Guidelines describes two overarching objectives that should inform a bank's residential mortgage lending activities. First, the bank must be able effectively to manage the various risks—including credit, legal, compliance, and reputation risks—associated with those activities. Second, the bank must not become engaged in abusive, predatory, unfair, or deceptive practices, directly, indirectly through mortgage brokers or other intermediaries, or through purchased loans. These objectives reflect expectations that are fundamental to sound banking practices. Different banks may achieve these objectives using different methods, however, and the Guidelines expressly recognize that the practices a bank follows in its residential mortgage lending activities need to be consistent with, and appropriate to, its size and complexity and the nature and scope of those activities.

*Part III: Implementation of Residential Mortgage Lending Practices*

Part III describes standards for the implementation of the objectives described in Part II. It comprises six components. First, Part III lists and briefly describes specific lending practices inconsistent with sound residential mortgage lending practices, including practices known as equity stripping, fee packing, and loan flipping, refinancing of a special subsidized mortgage on terms adverse to the consumer, and encouraging a borrower to breach a contract and default on an existing loan in connection with a refinancing of that loan. The features of these practices are widely recognized as abusive and were addressed by the OCC in our February, 2003 advisory letters.

Second, Part III describes certain loan terms, conditions and features—such as financing single premium insurance, negative amortization and mandatory arbitration—that may, under particular circumstances, be susceptible to abusive, predatory, unfair or deceptive practices, yet may be acceptable and may benefit customers under other circumstances. Part III cautions banks to exercise care when they offer loans containing these terms, conditions, and features, particularly in connection with subprime lending.

Third, banks that decide to offer loans with the types of features just described should take particular account of the circumstances of the consumers to whom the loans are offered. Banks

should exercise heightened diligence if they offer such loans to consumers who are elderly, substantially indebted, not financially sophisticated, have language barriers, have limited or poor credit histories, or have other characteristics that limit their credit choices. In addition, banks should apply heightened internal controls and monitoring with regard to this type of lending.

Fourth, banks should provide timely, sufficient, and accurate information to consumers concerning the terms and the relative costs, risks, and benefits of the loan.

Fifth, with respect to consumer residential mortgage loans that a bank purchases, or makes through a mortgage broker or other intermediary, the bank's residential mortgage lending activities also should include appropriate measures to mitigate risks. Part III provides a number of examples of such measures, including criteria for entering into and continuing relationships with intermediaries and originators, methods through which the bank may retain appropriate controls over mortgage origination functions, and criteria and procedures for the bank to take appropriate corrective action if necessary.

Finally, Part III makes clear that a bank's responsibilities for maintaining appropriate consumer residential mortgage lending practices are ongoing. For example, on a continuing basis, a bank should monitor its compliance with applicable law and its internal lending standards, and monitor and evaluate its handling of customer complaints. The bank's activities also should include appropriate steps for taking corrective action in response to failure to adhere to the requirements of the law or its internal lending standards, and for making adjustments to the bank's activities to enhance their effectiveness or to reflect changes in business practices, market conditions, or the bank's lines of business, residential mortgage loan programs, or customer base.

**Effective Date**

These Guidelines take effect April 8, 2005. The Administrative Procedure Act[10] (APA) requirements for notice and opportunity for comment do not apply to the Guidelines. The APA excepts from its notice and comment requirements, among other types of issuances, "general statements of policy."[11] General statements of policy

---

[10] 5 U.S.C. 551 et seq.
[11] 5 U.S.C. 553(b)(A).

6332 Federal Register / Vol. 70, No. 24 / Monday, February 7, 2005 / Rules and Regulations

are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [12] Consistent with this definition, courts have found that an issuance is a general statement of policy if it applies prospectively and "leaves the [agency] free to exercise [its] informed discretion in the situations that arise." [13]

Although these residential mortgage lending standards build on the standards in our 2003 Advisory Letters, their placement within the enforcement framework established by Section 39 of the FDIA applies prospectively only. Moreover, we are issuing the Guidelines in a form that, by the express terms of Section 39, preserves the OCC's discretion to require a compliance plan, and, thus, whether to initiate the part 30 process in any particular case. For these reasons, we conclude that the Guidelines fall within the APA exception for general statements of policy and that notice and comment procedures are, accordingly, not required.

## Regulatory Flexibility Analysis

The Regulatory Flexibility Act (RFA) does not apply to a rule for which an agency is not required to publish a notice of proposed rulemaking. 5 U.S.C. 603.

## Executive Order 12866

The OCC has determined that the Guidelines are not a significant regulatory action under Executive Order 12866.

## Unfunded Mandates Reform Act Analysis

The Unfunded Mandates Reform Act of 1995 (UMA), Public Law 104–4, applies only when an agency is required to promulgate a general notice of proposed rulemaking or a final rule for which a general notice of proposed rulemaking was published. 2 U.S.C. 1532. As noted earlier, the OCC has determined that a notice of proposed

---

[12] U.S. Department of Justice, Attorney General's Manual on the Administrative Procedure Act, at 30 n.3 (1947).

[13] Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp., 589 F.2d 658, 666–67 (D.C. Cir. 1978) (concluding that an FSLIC bulletin that used "directive" language to specify the criteria necessary for a satisfactory audit of a savings association was nonetheless a "general statement of policy" within the meaning of the APA because it preserved the FSLIC's discretion to accept a non-conforming audit report or to prescribe additional requirements in a particular case). See also Chen Zhon Chai v. Carroll, 48 F.3d 1331, 1341 (4th Cir. 1995) ("A rule is a general statement of policy if it does not establish a binding norm and leaves agency officials free to exercise their discretion.")

---

rulemaking was not required for these Guidelines. Accordingly, the OCC concludes that the UMA does not require an unfunded mandates analysis of the Guidelines.

Moreover, the OCC believes that the Guidelines will not result in expenditures by State, local, and tribal governments, or by the private sector, of more than $100 million in any one year. Accordingly, the OCC has not prepared a budgetary impact statement or specifically addressed the regulatory alternatives considered.

## List of Subjects in 12 CFR Part 30

Banks, banking, Consumer protection, National banks, Privacy, Reporting and recordkeeping requirements.

■ For the reasons set forth in the preamble, part 30 of chapter I of title 12 of the Code of Federal Regulations is amended as follows:

## PART 30—SAFETY AND SOUNDNESS STANDARDS

■ 1. The authority citation for part 30 is revised to read as follows:

**Authority:** 12 U.S.C. 93a, 371, 1818, 1831p, 3102(b); 15 U.S.C. 1681S, 1681W, 6801, 6805(b)(1).

## § 30.1 [Amended]

■ 2. Section 30.1(a) is amended by removing "appendices A and B" and adding in its place "appendices A, B, and C".

## § 30.2 [Amended]

■ 3. In § 30.2, add a final sentence to read as follows: "The OCC Guidelines Establishing Standards for Residential Mortgage Lending Practices are set forth in appendix C to this part."

## § 30.3 [Amended]

■ 4. Section 30.3(a) is amended by removing "and the Interagency Guidelines Establishing Standards for Safeguarding Customer Information set forth in appendix B to this part" and adding in its place "the Interagency Guidelines Establishing Standards for Safeguarding Customer Information set forth in appendix B to this part, or the OCC Guidelines Establishing Standards for Residential Mortgage Lending Practices set forth in appendix C to this part".

■ 5. A new Appendix C is added to part 30 to read as follows:

## Appendix C to Part 30—OCC Guidelines Establishing Standards for Residential Mortgage Lending Practices

### Table of Contents

I. Introduction
  A. Scope
  B. Preservation of Existing Authority
  C. Relationship to Other Legal Requirements
  D. Definitions
II. Standards for Residential Mortgage Lending Practices
  A. General
  B. Objectives
III. Implementation of Residential Mortgage Lending Standards
  A. Avoidance of Particular Loan Terms, Conditions, and Features
  B. Prudent Consideration of Certain Loan Terms, Conditions and Features
  C. Enhanced Care to Avoid Abusive Loan Terms, Conditions, and Features in Certain Mortgages
  D. Avoidance of Consumer Misunderstanding
  E. Purchased and Brokered Loans
  F. Monitoring and Corrective Action

### I. Introduction

i. These OCC Guidelines for Residential Mortgage Lending Practices (Guidelines) set forth standards pursuant to Section 39 of the Federal Deposit Insurance Act, 12 U.S.C. 1831p–1 (Section 39). The Guidelines are designed to protect against involvement by national banks and their operating subsidiaries, either directly or through loans that they purchase or make through intermediaries, in predatory or abusive residential mortgage lending practices that are injurious to bank customers and that expose the bank to credit, legal, compliance, reputation, and other risks. The Guidelines focus on the substance of activities and practices, not the creation of policies. The Guidelines are enforceable under Section 39 in accordance with the procedures prescribed by the regulations in 12 CFR part 30.

ii. As the OCC has previously indicated in guidance to national banks and in rulemaking proceedings (OCC Advisory Letters 2003–2 and 2003–3 (Feb. 21, 2003)), many of the abusive practices commonly associated with predatory mortgage lending, such as loan flipping and equity stripping, will involve conduct that likely violates the Federal Trade Commission Act's (FTC Act) prohibition against unfair or deceptive acts or practices. 15 U.S.C. 45. In addition, loans that involve violations of the FTC Act, or mortgage loans based predominantly on the foreclosure or liquidation value of the borrower's collateral without regard to the borrower's ability to repay the loan according to its terms, will involve violations of OCC regulations governing real estate lending activities, 12 CFR 34.3 (Lending Rules).

iii. In addition, national banks and their operating subsidiaries must comply with the requirements and Guidelines affecting appraisals of

---

residential mortgage loans and appraiser independence. 12 CFR part 34, subpart C, and the Interagency Appraisal and Evaluation Guidelines (OCC Advisory Letter 2003–9 (October 28, 2003)). For example, engaging in a practice of influencing the independent judgment of an appraiser with respect to a valuation of real estate that is to be security for a residential mortgage loan would violate applicable standards.

iv. Targeting inappropriate credit products and unfair loan terms to certain borrowers also may entail conduct that violates the FTC Act, as well as the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act (FHA). 15 U.S.C. 1691 et seq. 42 U.S.C. 3601 et seq. For example, "steering" a consumer to a loan with higher costs rather than to a comparable loan offered by the bank with lower costs for which the consumer could qualify, on a prohibited basis such as the borrower's race, national origin, age, gender, or marital status, would be unlawful.

v. OCC regulations also prohibit national banks and their operating subsidiaries from providing lump sum, single premium fees for debt cancellation contracts and debt suspension agreements in connection with residential mortgage loans. 12 CFR 37.3(c)(2). Some lending practices and loan terms, including financing single premium credit insurance and the use of mandatory arbitration clauses, also may significantly impair the eligibility of a residential mortgage loan for purchase in the secondary market.

vi. Finally, OCC regulations and supervisory guidance on fiduciary activities and asset management address the need for national banks to perform due diligence and exercise appropriate control with regard to trustee activities. See 12 CFR 9.6 (a) and Comptroller's Handbook on Asset Management. For example, national banks should exercise appropriate diligence to minimize potential reputation risks when they undertake to act as trustees in mortgage securitizations.

A. *Scope.* These Guidelines apply to the residential mortgage lending activities of national banks, federal branches and agencies of foreign banks, and operating subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers).

B. *Preservation of Existing Authority.* Neither Section 39 nor these Guidelines in any way limits the authority of the OCC to address unsafe or unsound practices or conditions, unfair or deceptive practices, or other violations of law. The OCC may take action under Section 39 and these Guidelines

independently of, in conjunction with, or in addition to any other enforcement action available to the OCC.

C. *Relationship to Other Legal Requirements.* Actions by a bank in connection with residential mortgage lending that are inconsistent with these Guidelines or Appendix A to this Part 30 may also constitute unsafe or unsound practices for purposes of section 8 of the Federal Deposit Insurance Act, 12 U.S.C. 1818, unfair or deceptive practices for purposes of section 5 of the FTC Act, 15 U.S.C 45, and the OCC Lending Rules, 12 CFR 34.3, or violations of the ECOA and FHA.

D. *Definitions.*

1. Except as modified in these Guidelines, or unless the context otherwise requires, the terms used in these Guidelines have the same meanings as set forth in sections 3 and 39 of the Federal Deposit Insurance Act, 12 U.S.C. 1813 and 1831p–1.

2. For purposes of these Guidelines, the following definitions apply:

a. *Residential mortgage loan* means any loan or other extension of credit made to one or more individuals for personal, family, or household purposes secured by an owner-occupied 1–4 family residential dwelling, including a cooperative unit or mobile home.

b. *Bank* means any national bank, federal branch or agency of a foreign bank, and any operating subsidiary thereof that is subject to these Guidelines.

II. Standards for Residential Mortgage Lending Practices

A. *General.* A bank's residential mortgage lending activities should reflect standards and practices consistent with and appropriate to the size and complexity of the bank and the nature and scope of its lending activities.

B. *Objectives.* A bank's residential mortgage lending activities should reflect standards and practices that:

1. Enable the bank to effectively manage the credit, legal, compliance, reputation, and other risks associated with the bank's consumer residential mortgage lending activities.

2. Effectively prevent the bank from becoming engaged in abusive, predatory, unfair, or deceptive practices, directly, indirectly through mortgage brokers or other intermediaries, or through purchased loans.

III. Implementation of Residential Mortgage Lending Standards

A. *Avoidance of Particular Loan Terms, Conditions, and Features.* A bank should not become involved,

directly or indirectly in residential mortgage lending activities involving abusive, predatory, unfair or deceptive lending practices, including, but not limited to:

1. *Equity Stripping and Fee Packing.* Repeat refinancings where a borrower's equity is depleted as a result of financing excessive fees for the loan or ancillary products.

2. *Loan Flipping.* Repeat refinancings under circumstances where the relative terms of the new and refinanced loan and the cost of the new loan do not provide a tangible economic benefit to the borrower.

3. *Refinancing of Special Mortgages.* Refinancing of a special subsidized mortgage that contains terms favorable to the borrower with a loan that does not provide a tangible economic benefit to the borrower relative to the refinanced loan.

4. *Encouragement of Default.* Encouraging a borrower to breach a contract and default on an existing loan prior to and in connection with the consummation of a loan that refinances all or part of the existing loan.

B. *Prudent Consideration of Certain Loan Terms, Conditions and Features.* Certain loan terms, conditions and features, may, under particular circumstances, be susceptible to abusive, predatory, unfair or deceptive practices, yet may be appropriate and acceptable risk mitigation measures, consistent with safe and sound lending, and benefit customers under other circumstances. A bank should prudently consider the circumstances, including the characteristics of a targeted market and applicable consumer and safety and soundness safeguards, under which the bank will engage directly or indirectly in making residential mortgage loans with the following loan terms, conditions and features:

1. Financing single premium credit life, disability or unemployment insurance.

2. Negative amortization, involving a payment schedule in which regular periodic payments cause the principal balance to increase.

3. Balloon payments in short-term transactions.

4. Prepayment penalties that are not limited to the early years of the loan, particularly in subprime loans.

5. Interest rate increases upon default at a level not commensurate with risk mitigation.

6. Call provisions permitting the bank to accelerate payment of the loan under circumstances other than the borrower's default under the credit agreement or to mitigate the bank's exposure to loss,

6334    Federal Register / Vol. 70, No. 24 / Monday, February 7, 2005 / Rules and Regulations

7. Absence of an appropriate assessment and documentation of the consumer's ability to repay the loan in accordance with its terms, commensurate with the type of loan, as required by Appendix A of this part.

8. Mandatory arbitration clauses or agreements, particularly if the eligibility of the loan for purchase in the secondary market is thereby impaired.

9. Pricing terms that result in the loan's being subject to the provisions of the Home Ownership and Equity Protection Act. 15 U.S.C. 1639 et seq.

10. Original principal balance of the loan in excess of appraised value.

11. Payment schedules that consolidate more than two periodic payments and pay them in advance from the loan proceeds.

12. Payments to home improvement contractors under a home improvement contract from the proceeds of a residential mortgage loan other than by an instrument payable to the consumer, jointly to the consumer and the contractor, or through an independent third party escrow agent.

C. *Enhanced Care to Avoid Abusive Loan Terms, Conditions, and Features in Certain Mortgages.* A bank may face heightened risks when it solicits or offers loans to consumers who are not financially sophisticated, have language barriers, or are elderly, or have limited or poor credit histories, are substantially indebted, or have other characteristics that limit their choices. In connection with such consumers, a bank should exercise enhanced care if it employs the residential mortgage loan terms, conditions, and features described in paragraph B of this section III, and should also apply appropriate heightened internal controls and monitoring to any line of business that does so.

D. *Avoidance of Consumer Misunderstanding.* A bank's residential mortgage lending activities should include provision of timely, sufficient, and accurate information to a consumer concerning the terms and costs, risks, and benefits of the loan. Consumers should be provided with information sufficient to draw their attention to these key terms.

E. *Purchased and Brokered Loans.* With respect to consumer residential mortgage loans that the bank purchases, or makes through a mortgage broker or other intermediary, the bank's residential mortgage lending activities should reflect standards and practices consistent with those applied by the bank in its direct lending activities and include appropriate measures to mitigate risks, such as the following:

1. Criteria for entering into and continuing relationships with intermediaries and originators, including due diligence requirements.

2. Underwriting and appraisal requirements.

3. Standards related to total loan compensation and total compensation of intermediaries, including maximum rates, points, and other charges, and the use of overages and yield-spread premiums, structured to avoid providing an incentive to originate loans with predatory or abusive characteristics.

4. Requirements for agreements with intermediaries and originators, including with respect to risks identified in the due diligence process, compliance with appropriate bank policies, procedures and practices and with applicable law (including remedies for failure to comply), protection of the bank against risk, and termination procedures.

5. Loan documentation procedures, management information systems, quality control reviews, and other methods through which the bank will verify compliance with agreements, bank policies, and applicable laws, and otherwise retain appropriate oversight of mortgage origination functions, including loan sourcing, underwriting, and loan closings.

6. Criteria and procedures for the bank to take appropriate corrective action, including modification of loan terms and termination of the relationship with the intermediary or originator in question.

F. *Monitoring and Corrective Action.* A bank's consumer residential mortgage lending activities should include appropriate monitoring of compliance with applicable law and the bank's lending standards and practices, periodic monitoring and evaluation of the nature, quantity and resolution of customer complaints, and appropriate evaluation of the effectiveness of the bank's standards and practices in accomplishing the objectives set forth in these Guidelines. The bank's activities also should include appropriate steps for taking corrective action in response to failures to comply with applicable law and the bank's lending standards, and for making adjustments to the bank's activities as may be appropriate to enhance their effectiveness or to reflect changes in business practices, market conditions, or the bank's lines of business, residential mortgage loan programs, or customer base.

Dated: January 31, 2005.

Julie L. Williams,

*Acting Comptroller of the Currency.*

[FR Doc. 05–2211 Filed 2–4–05; 8:45 am]

BILLING CODE 4810-33-P

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 71

[Docket No. FAA–2005–20060; Airspace Docket No. 05–ACE–2]

**Modification of Class E Airspace; Rolla, MO**

AGENCY: Federal Aviation Administration (FAA), DOT.

ACTION: Direct final rule; request for comments.

SUMMARY: This action amends Title 14 Code of Federal Regulations, part 71 (14 CFR 71) by revising Class E airspace at Rolla, MO. A review of controlled airspace for Rolla Downtown Airport revealed it does not comply with the criteria for 700 feet above ground level (AGL) airspace required for diverse departures. The area is modified and enlarged to conform to the criteria in FAA Orders.

DATES: This direct final rule is effective on 0901 UTC, May 12, 2005. Comments for inclusion in the Rules Docket must be received on or before March 2, 2005.

ADDRESSES: Send comments on this proposal to the Docket Management System, U.S. Department of Transportation, Room Plaza 401, 400 Seventh Street, SW., Washington, DC 20590–0001. You must identify the docket number FAA–2005–20060/ Airspace Docket No. 05–ACE–2, at the beginning of your comments. You may also submit comments on the Internet at *http://dms.dot.gov*. You may review the public docket containing the proposal, any comments received, and any final disposition in person in the Dockets Office between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Docket Office (telephone 1–800–647–5527) is on the plaza level of the Department of Transportation NASSIF Building at the above address.

FOR FURTHER INFORMATION CONTACT: Brenda Mumper, Air Traffic Division, Airspace Branch, ACE–520A, DOT Regional Headquarters Building, Federal Aviation Administration, 901 Locust, Kansas City, MO 64106; telephone: (816) 329–2524.

SUPPLEMENTARY INFORMATION: This amendment to 14 CFR 71 modifies the Class E airspace area extending upward

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
ANTONIO CIMMARRUSTI and STELLA S. CIMMARRUSTI

**DEFENDANTS**
AURORA LOAN SERVICES, LLC; QUALITY LOAN SERVICE CORP; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC; VAHE HAYRAPETIAN; GMAC MORTGAGE, LLC fka GMAC MORTGAGE CORPORATION; KATHY OHANIANS; FIRST FUNDERS; and Does 1 through 30, inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
BURLISON & LUOSTARI
Walter R. Luostari
1117 Foothill Boulevard, Suite A
La Canada, California 91011
Telephone: 818-790-2044 / Facsimile: 818-949-4925

Attorneys (If Known)
LOCKE LORD BISSELL & LIDDELL LLP
Thomas J. Cunningham, tcunningham@lockelord.com
Kayla Birns, kbirns@lockelord.com
300 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telephone: 213-485-1500 / Facsimile: 213-485-1200

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Truth In Lending Act, 15 U.S.C. §§ 1601 et seq.; Federal Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1637 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☒ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities – Employment | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | IMMIGRATION | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | ☐ 463 Habeas Corpus-Alien Detainee | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:

**CONFORM COPY**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)

CIVIL COVER SHEET

American LegalNet, Inc.
www.FormsWorkflow.com

Page 1 of 2

CV09-04280

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles (Antonio Cimmarrusti); Los Angeles (Stella S. Cimmarrusti) | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles (Vahe Hayrapetian); Los Angeles (Kathy Ohanians); Los Angeles (First Funders) | Pennsylvania (GMAC MORTGAGE, LLC); Colorado (Aurora Loan Services, LLC); San Diego (Quality Loan Service Corp); Virginia (Mortgage Electronic Registration Systems, Inc) |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** Kayla Birns   Date June 15, 2009

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Ronald S. W. Lew and the assigned discovery Magistrate Judge is Suzanne H. Segal.

The case number on all documents filed with the Court should read as follows:

## CV09- 4280 RSWL (SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[_] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[_] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.